**Fred B. ABRAMSON, Plaintiff,**

**v.**

**NYTRONICS, INC., et al., Defendants.**

**No. 70 Civ. 410.**

United States District Court,
S. D. New York.

April 3, 1970.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff; Philip Jones, Howard L. Jacobs, Robert M. Kornreich, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for defendant Gulton Industries, Inc.; Max Freund, Gerald Walpin, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant Bernard M. Goldsmith.

Upham, Meeker & Weithorn, New York City, for defendant Nytronics, Inc.

Simpson, Thacher & Bartlett, New York City, for defendants Walter F. Gips and Glenn N. Howatt.

MANSFIELD, District Judge.

This derivative and representative stockholders' action on behalf of Gulton Industries, Inc. ("Gulton"), seeks to enjoin consummation of an agreement between Gulton and Nytronics, Inc. whereby Gulton is to acquire 650,000 shares, or 20.4% of its own common stock from Nytronics in exchange for $5 million and certain assets of Gulton. Plaintiff, the owner of 100 Gulton shares, moves for a preliminary injunction barring the holding of a meeting of Gulton stockholders for the purpose of approving the Gulton-Nytronics agreement.

The underlying suit, apart from a common law claim against Gulton's directors for breach of fiduciary duties and corporate waste, is based upon alleged false and misleading statements contained in proxy materials distributed by Gulton to its shareholders, which are claimed to violate §§ 10 and 14 of the Securities Exchange Act and SEC Rules 14a–9 and 10b–5.

On April 29, 1969, after some six months of intermittent discussions between Gulton and Nytronics about the possibility of a merger of the two companies, Nytronics agreed to purchase a block of 650,000 shares of Gulton common stock from Leslie K. Gulton, then Chairman of the Board and chief executive officer of Gulton, his wife, Edith Gulton, a Gulton director, and the Gulton family foundation. Nytronics agreed to pay $35 per share, or an aggregate of $22,750,000, plus a warrant to purchase one-third share of Nytronics common stock at a price of $30 per full share for each share of Gulton stock. The sale to Nytronics was completed on May 29, 1969.

Following its purchase of the 650,000 shares, Nytronics informed the Gulton board of directors that it wanted to designate six of the eleven seats on the board. Gulton refused, and instead proposed that Nytronics designate three representatives for election at the June 30 stockholders' meeting. Three Nytronics representatives were accordingly elected to the Gulton board.

At the time of the April 29 agreement, and on several occasions thereafter, Nytronics publicly announced its intention to make a comparable exchange offer to the remaining Gulton shareholders. On May 5, Gulton authorized Lehman Brothers to investigate the advisability of a merger of Gulton and Nytronics. Lehman Brothers advised against the proposal in a report with which all of Gulton's directors later concurred.

Because of the attitude of Gulton's directors and a substantial drop in the market price of Nytronics' stock, Nytronics decided in late July or early August not to make an exchange offer for the remaining Gulton shares. After the possibility of a cash tender offer was considered and discarded because of the high cost of financing, Nytronics made unsuccessful attempts over a period of four to six weeks to sell its block of Gulton shares.

During the late summer discussions between representatives of Gulton and Nytronics turned to the possibility of Gulton's purchasing the block of 650,000 of its shares held by Nytronics. It appears that the members of the Gulton board of directors, other than the three Nytronics representatives, were unaware of attempts made by Nytronics to sell the shares elsewhere. Negotiation proceeded on the basis that Gulton would give operating assets in exchange for the stock, and that approximately 20% of Gulton's earnings potential should be given as consideration for the 20% block of stock in question.

At least five operating divisions of Gulton were considered for inclusion in an asset package to be exchanged for the Gulton shares. After a number of combinations proposed by Nytronics had been rejected by Gulton, it was finally agreed, on October 14, 1969, that the consideration to be given for the shares would be two Gulton divisions—Continental Wire & Cable Corp. and Sage Electronics Corp.—plus $5,000,000 in cash. The formal agreement incorporating this understanding was approved by Gulton's Executive Committee on November 10, and executed on November 12, 1969. Although the management of Gulton is not obligated to recommend approval of the agreement to Gulton's shareholders, the latter must approve the transaction at a special meeting called for the purpose before the agreement can take effect. Gulton accordingly issued and mailed to its stockholders a 52-page proxy statement with a notice of special meeting of stockholders to be held on February 18, 1970, for the purpose of securing stockholder approval of

the proposed repurchase and retirement of the 650,000 Gulton shares.

On January 30, 1970, plaintiff commenced this action, moving on February 16 by order to show cause for a preliminary injunction preventing the holding of the meeting scheduled for the 18th. Upon argument of the motion on February 17, defendants agreed to adjourn the meeting to March 24 and to issue supplemental proxy material which they believed would meet the objections to the original proxy statement raised in plaintiff's complaint. Further argument on plaintiff's request for a preliminary injunction was held in abeyance pending the issuance of such material.

Defendant Gulton had already, on February 9, sent a one-page letter to its shareholders describing and briefly rebutting the major allegations of the January 30 complaint and enclosing a new proxy. Following plaintiff's amendment of his complaint on February 20, Gulton sent to each of its stockholders an eight-page letter, dated March 10, setting forth certain financial information not contained in the original proxy material. In addition, five pages of the letter were devoted to quoting plaintiff's contentions as to the false and misleading character of the original proxy statement and furnishing information and reasons in rebuttal. Again a superseding proxy card was enclosed. Plaintiff, however, was not satisfied, and the motion for a preliminary injunction was accordingly argued on March 17. We deny the motion for the reasons detailed below.

Plaintiff's fundamental objection to the proposed purchase of Gulton shares is that the consideration to be given therefor is grossly excessive, particularly in light of a substantial decline in the market value of the shares since the date of the agreement for their purchase. On October 14, 1969, the day on which the agreement in principle was reached between Gulton and Nytronics, the market value of the 650,000 shares to be acquired was $14,706,250. By February 9 this figure had dropped to $8,612,500,

and is now at approximately $8,450,000. Plaintiff contends that if the agreement is consummated Gulton will pay $5 million plus assets valued between $18 million and $23 million for these shares, which are now worth only about $8.5 million on the market. The true motive for the purchase, plaintiff alleges, is fear on the part of the Gulton board that the 650,000 shares, constituting at least the nucleus of a controlling interest in the company, may fall into unfriendly hands and result in their ouster from comfortable and lucrative positions in control of Gulton.

The complaint also sets forth a variety of allegedly false and misleading statements and omissions in the proxy material distributed to the Gulton shareholders which are claimed to violate §§ 10 and 14 of the Securities and Exchange Act and SEC Rules 10b–5 and 14a–9. In addition to a § 10 and Rule 10b–5 claim arising out of the sale for allegedly inadequate consideration, a further common law claim of corporate waste and breach of fiduciary duty on the part of the Gulton directors is attached on the theory of "pendent jurisdiction."

Before a preliminary injunction will issue, the moving party must demonstrate the likelihood that he will ultimately prevail upon the merits, and that he will suffer greater irreparable injury from denial of injunctive relief than any hardship to the opposing party from the granting of such relief. *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Clairol, Inc. v. Gillette Co.,* 389 F.2d 264 (2d Cir. 1968); *Unicon Management Corp. v. Koppers Co.,* 366 F.2d 199, 204 (2d Cir. 1966); *Dino deLaurentiis Cinematografica, S.p.A. v. D–150, Inc.,* 366 F.2d 373 (2d Cir. 1966). However, the burden of showing probable success is less where the balance of hardship tips decidedly toward the party requesting temporary relief. *Checker Motors Corp. v. Chrysler Corp., supra* at 323. In the instant case

plaintiff has failed to show that Gulton or its stockholders will suffer any irreparable injury if injunctive relief is denied, let alone a balance of hardship in plaintiff's favor. Continental and Sage are both self-contained business entities, and will apparently continue to be operated as such should the Gulton shareholders approve their transfer to Nytronics. The difficulties and expense that would be entailed in a return to the *status quo ante,* should the acquisition be set aside after trial, would thus be minimal. Were we to grant the injunction requested, on the other hand, the defendants would be prejudiced in a number of respects. The November 12 Gulton-Nytronics agreement requires that the closing take place by May 12, 1970, and obligates Gulton to continue making loans to Continental and Sage until the date of the closing. Equally important, the issuance of an injunction may be understood by Gulton shareholders as evidence that we are of the opinion that there has been wrongdoing on the part of the Gulton management. Sherman v. Posner, 266 F.Supp. 871, 874 (S.D.N.Y.1966). Only if movant actually presents clear evidence of such wrongdoing should this form of relief be granted.

### The Proxy Material

■ In order to state a claim based upon the federal securities laws and regulations prohibiting misleading proxy material, plaintiff must establish that the material in question misstated, or omitted to state, one or more "material facts"—facts of such a nature that they could normally be expected to lead a reasonable stockholder not to vote in favor of the proposal set forth in the material. Crane Co. v. Westinghouse Air Brake

Co., 419 F.2d 787, 799 (2d Cir. 1969); Richland v. Crandall, 262 F.Supp. 538, 553 (S.D.N.Y.1967). Defendant-directors were obligated to make a full and fair disclosure of those facts which a stockholder would need in order to make an intelligent and informed decision on Gulton's proposed purchase of its shares. They were not, however, required to present to the Gulton shareholders all the arguments that could be made against their recommendations. The proxy provisions of Rules 14a–9 and 10b–5 are aimed at *disclosure of all material facts,* not at ensuring an exhaustive, dispassionate, and evenly balanced presentation of conflicting interpretations of the facts given. It is of course possible to present facts in a manner calculated to confuse and deceive, e. g., Norte and Co. v. Huffines, 304 F.Supp. 1096, 1106 (S.D.N.Y.1968), but absent some evidence of unfairness or lack of good faith in the mode of presentation, it is enough if proxy material sets forth all the facts necessary to enable a reasonably intelligent stockholder to make his own informed decision. See Crane Co. v. Westinghouse Air Brake Co., *supra;* Richland v. Crandall, *supra.*

Regardless of the accuracy or completeness of the original proxy statement, Gulton's March 10 letter quoted verbatim, in italics, at the head of individually numbered paragraphs discussing the quoted material, each and every one of plaintiff's allegations in his amended complaint as to the alleged falsity of the original proxy statement. Each numbered allegation is followed by a brief discussion of between one paragraph and one page in length, dealing with the substance of the charge and setting forth facts and figures in rebuttal where appropriate.[1] The letter is a

---

1. There is one minor exception. Paragraph 8 of the letter reads as follows:

    "8. Plaintiff alleges: '*Although the proxy statement at page 7 mentions the unfavorable recent operations of Continental and Sage, it omitted a number of significant favorable factors including*:

    I. *Savings of $216,000 per year in overhead from vacated plant of Continenental;*

    II. *Recent price increases of Continental not yet reflected in earnings;*

    III. *Restoration of Continental's labor efficiency after move;*

candid presentation of plaintiff's objections and of management's answers thereto. To quote one example, paragraph 7 of the letter reads as follows:

"Plaintiff alleges: *'It was false and misleading to use the six months ended August 31, 1969 results of the divisions for the purpose of testing the fairness of the merger since this was a period of extraordinary expenses of the divisions and decreased future costs.'*

"Plaintiff refers only to the figures for the six months ended August 31, 1969, although the proxy statement set forth comparable figures for the five fiscal years ended February 28, 1969, and for the six months ended August 31, 1968 in each statement of earnings, including those relating only to Continental and Sage. In addition, the proxy statement, on page 8, sets forth the results of operations of Continental and Sage for the three months ended November 30, 1969. Furthermore, the proxy statement, in the explanatory material on page 7, immediately after the combined statement of earnings of Continental and Sage, states not only the principal reasons for the fluctuations in profits of Continental and Sage, but also the fact that *during the six months ended August 31, 1969, another contributing factor to the reduction in the net earnings of Continental was its unusual expenses in connection with the relocation of a plant.*

"The proxy statement does not suggest at any place that the results for the six months ended August 31, 1969 were typical of the operations of Continental and Sage. On the contrary, it is specifically stated (p. 7) that:

'The results of operations for the 1969 interim period are not necessarily indicative of results which may be expected for the fiscal year ending February 28, 1970.'

"There is no suggestion in the proxy statement that the operating results for the interim period ended August 31, 1969 were or should be used 'for the purpose of testing the fairness of the merger.' The operating results of Continental and Sage during the months of December 1969 and January 1970 (see page 2 hereof) and in the different periods set forth in the proxy statement and in this letter should be taken into consideration by the Company's shareholders in arriving at a determination as to whether the proposed transaction is in the best interest of the Company. See, also, the table in the proxy statement (top p. 8) entitled 'Contribution of Continental Wire & Cable Corp. and Sage Electronics Corporation to Sales and Earnings of Gulton Industries, Inc.' "

█ Nevertheless, plaintiff now argues that the March 10 letter is insufficient for the reason that although it quotes plaintiff's charges it gives management's contentions without also furnishing plaintiff's contentions. The ar-

---

IV. *Loss of interest collected by Continental, which would now go to Nytronics;*

V. *Growth in volume of Continental's commercial sales by reason of reorganization of sales department.'*

"Page 7 of the proxy statement does not mention 'the unfavorable recent operations of Continental and Sage.' Aside from a brief factual explanation for the fluctuations in profits of Continental and Sage (bottom p. 7), the proxy statement did not attempt to set forth every business consideration which was evaluated by the Company's Board of Directors. Indeed, it is not believed that it is proper to do so.

The factors referred to by plaintiff involve matters of opinion, forecasts of the future and the like. They do not permit of factual statement.

"The five items relating to Continental listed by plaintiff were apparently culled from a report prepared by the accountants for Nytronics which was not furnished to the Company but was furnished to plaintiff by Nytronics at the request of the plaintiff."

The letter here does not discuss the items listed, and fails to mention that the report prepared by the accountants for Nytronics was assembled principally from material furnished by a Gulton financial vice president.

gument misconceives the standard required of proxy material by Rules 10b–5 and 14a–9. Management need *not* present the contentions of both sides so long as it supplies its stockholders with all the facts material to an independent decision on the merits of the proposed transaction. This standard has been met in the instant case.

Plaintiff further contends that "the fragmenting of the information into three separate documents makes the stockholders' task of understanding the material hopeless," and suggests that "This Court should direct that new proxy material be prepared containing all of the material facts, to be approved by the Securities and Exchange Commission and this Court." Aside from the fact that the original proxy statement and two supplemental letters were submitted to the SEC before being sent to Gulton's shareholders, and no objections have been voiced by the Commission, which is a factor entitled to some weight, see 601 West 26 Corp. v. Solitron Devices, Inc., 291 F.Supp. 882, 886 (S.D.N.Y.1968); Kauder v. United Board & Carton Corp., 199 F.Supp. 420 (S.D.N.Y.1961), the consolidation suggested by plaintiff would serve little purpose, since the concentration of plaintiff's objections in the company's final communication to its shareholders should have had the effect of maximizing their impact.

Plaintiff's final argument is that management's reliance upon superseding proxy cards improperly places upon stockholders the burden of voiding their old proxies, and that an entirely new vote should therefore be required. It seems unlikely, however, that anyone who had voted upon the basis of the original 52-page proxy statement would have failed to give attention to the subsequent 8-page letter, particularly when it clearly indicated on its first page that it dealt with a lawsuit relating to the earlier statement. Furthermore, while for purposes of this motion we have not thought it necessary to pass upon plaintiff's contentions as to the falsity and incompleteness of the original proxy statement, we think it is relevant, in denying plaintiff's request for a new vote, to note that the original proxy statement gives a generally clear and fair presentation of the essential facts.

### The 10b and 10b–5 Claim

In addition to a Rule 10b–5 claim based on the allegedly false and misleading proxy material, which has been disposed of above, plaintiff alleges two other 10b and 10b–5 violations: that a fraud was committed in that the 650,000 shares of Gulton stock were grossly inadequate consideration for the assets agreed to be exchanged for them, and that it was fraudulent for Nytronics to fail to disclose that it had tried unsuccessfully to sell the shares before offering them to Gulton.

We fail to see how either of these allegations can support a claim under Rule 10b–5 when the transaction out of which the fraud is claimed to arise can be consummated only with the approval of a group of stockholders to whom full and fair disclosure has been made in advance of their vote on the proposal. The Gulton shareholders now know of Nytronics' earlier efforts to sell the 650,000 shares, and have been given up-to-the-minute information on sales, earnings, stock prices and the like. Rule 10b–5 is basically a disclosure provision; if plaintiff claims that regardless of disclosure and shareholder approval the directors of Gulton are to be held liable for a breach of fiduciary duty based on waste of corporate assets, his remedy lies under state rather than federal law.

### The Pendent Claim of Corporate Waste

Plaintiff's final claim is that the Gulton directors are liable for breach of fiduciary duty based on waste of corporate assets and an absence of corporate purpose to the transaction. The burden of proof imposed upon plaintiff by Delaware law (both Gulton and Nytronics are Delaware corporations) in order to establish such charges is a heavy one. While it is true that purchase of its own shares "is not ordinari-

ly an essential corporate function," Propp v. Sadacca, 40 Del.Ch. 113, 175 A.2d 33 (1961), and that directors who consummate such a transaction, particularly where its effect will be to eliminate a possible threat to incumbent management, bear the burden of demonstrating that it will be in the corporate interest, Bennett v. Propp, 41 Del.Ch. 14, 187 A.2d 405, 409 (1962), stockholder ratification brings into play an entirely different set of rules. Upon a showing of approval of the transaction by a "legally disinterested group of stockholders owning a majority of all of the outstanding shares," the burden shifts to plaintiff to show that "the disparity between the money received and the value of the assets sold is so great that the court will infer that those passing judgment are guilty of improper motives or are recklessly indifferent to or intentionally disregarding the interest of the whole body of stockholders." Schiff v. RKO Pictures Corp., 34 Del.Ch. 329, 104 A.2d 267 (1954), quoted in Alcott v. Hyman, 208 A.2d 501, 505 (Del.1965). That stockholder ratification has not yet taken place in the instant case makes no difference to the standard to be applied: if the proposal is defeated by the stockholders, plaintiff's case is rendered moot, so that it is appropriate for us to proceed on the assumption that the purchase will be approved.

■ Since ratification is given less weight where it could not have been carried without the votes of the interested parties, 1 G. Hornstein, Corporation Law and Practice § 440 (1959), it becomes relevant to determine whether approval may require votes of such parties. Some indication of the probable vote on the proposal may be derived from the figures on proxies held by the management proxy committee at the time of the adjournment of the stockholders' meeting on February 18. At that time, with 3,292,043 shares of Gulton common and voting preferred outstanding, the committee held proxies for 2,060,408 shares in favor of the proposal, 175,796 against, and 341,411 with instructions not to vote. The 2,060,408 shares to be voted in favor included the 650,000 shares held by Nytronics, as well as 316,588 shares held by three members of the Gulton board of directors. This left 1,093,820 disinterested votes in favor, as against 175,796 in opposition, or about 33% versus 5% respectively. Of course the subsequent distribution of supplemental proxy material may modify these figures, but they do suggest that while independent shareholders can be expected to vote heavily in favor of the proposed transaction, the votes of shares held by interested parties will be required to achieve the majority necessary for approval. Hence we conclude that on trial of this case plaintiff would bear the burden of making something more than a prima facie showing, though not as much as a "clear and convincing case," of gross inadequacy of consideration, whereupon the burden would shift to the defendants to explain the business reasons for their recommendation. The same standard is appropriate on the present motion for preliminary relief.

Plaintiff's claim of gross inadequacy of consideration is based on the marked disparity between the market value of the shares to be acquired and valuations placed upon the operating assets of Continental and Sage by several experts in the field. The market value of the 650,000 shares, arrived at by using the price per share on the New York Stock Exchange as a multiplier, was $14,706,250 on October 14, 1969, dropped to $8,612,500 on February 9, 1970, reached a low of about $7,525,000 in mid-March, and has more recently begun to gain. From these figures plaintiff subtracts the $5,000,000 in cash which Gulton is to give for the shares in addition to the two divisions, and concludes that the balance, presently about $3 to $3.5 million, represents the amount which Gulton would receive as consideration for the assets of Sage and Continental.

In support of his claims plaintiff relies first upon an affidavit dated February 13, 1970, by Irving Kuller, a senior partner in the accounting firm of David

Berdon & Co. retained by plaintiff to prepare an opinion as to the fairness of the Gulton purchase. The Kuller affidavit, which contains a good deal of argumentative material bordering upon zealous legal advocacy, does not attempt to place a dollar value on the assets of the Sage and Continental divisions. Instead it concludes that "the proposed transaction cannot meet the test of fairness for Gulton and its shareholders." As a basis for this conclusion it observes that since the market value of the stock to be acquired has dropped more than 40% in value since the execution of the purchase agreement in November of 1969, such a substantial change in circumstances necessitates complete reconsideration of the transaction by the Gulton board before it is submitted to the stockholders for approval. Kuller also questions certain of the accounting practices and conclusions found in the original Gulton proxy statement, and points out that no business justification for the purchase has been offered. He takes issue with the conclusion of the November 25 report by Lehman Brothers (referred to in the proxy statement) that the transaction would have the effect of increasing Gulton's earnings per share by about 6%, basing his objections on use of an 11% rather than a 7% interest rate on short term borrowing [2] and on an allegedly misleading claim that "home office expenses" previously allocated to Continental and Sage would be saved by the transfer of these divisions to Nytronics.

Kuller also takes issue with the use in the Lehman Brothers report of operating results for the six months ending August 31, 1969, as a basis for testing the fairness of the proposed transaction. He points out that Continental experienced abnormal expenses of a non-recurring nature during this period, and he mentions recent favorable developments, such as a recent reorganization and expansion of the Continental sales force and recent price increases, which are not set forth in the proxy statement. With all favorable factors taken into account, according to Kuller, a "conservative" figure for the two divisions' after-tax earnings in the first year after the sale would be $600,000, which is about one-sixth of the current market value of the 650,000 shares to be received in exchange for the divisions, after subtraction of the $5,000,000 to be given in cash. A multiplier of 6, the affidavit points out, is less than half of the multiplier of 13 at which Gulton stock is currently selling.

In a supplemental affidavit dated March 17, 1970, in response to Gulton's supplemental letter of March 10, Kuller presents additional facts and arguments. First he refers to earnings figures for Continental and Sage for December, 1969, and January, 1970, months during which the two divisions were under Nytronics management pursuant to the agreement of November 12. These show a substantial increase over the figures for the previous year, and would, if continued or extrapolated, result in earn-

2. Gulton explains its use of the 7% figure as follows in paragraph 4 of the March 10 letter:

"In order to determine what the operating results of the Company would have been if the transaction with Nytronics had taken place prior to August 31, 1969, management recognized the propriety of charging the 'continuing operations' (i. e. without Continental and Sage) with interest on $5,000,000 which presumably would have been borrowed in those prior periods to effectuate the transaction with Nytronics. In preparing the *pro forma* figures for prior periods, it was determined to show the *then* cost of borrowing (not the current interest rate) since we were attempting to show what the earnings *would* have been in the prior periods. Hence the 7% rate was used which reflected our average cost of borrowing during the periods in question.

"If an 11% rate had been used, the charge each year would have been $275,000 instead of $175,000. A pro forma statement of the net earnings of the continuing operations adjusted to reflect, among other things, an 11% interest rate is found on page 6 hereof."

ings for the year 1970 of $714,000, or $114,000 more than the $600,000 estimate on which the conclusion of the first affidavit was based. During the months of December and January, moreover, Continental and Sage accounted for some 46% of the combined earnings of all Gulton divisions, a figure which the affidavit contrasts with the announced purpose of exchanging approximately 20% of Gulton's earning capacity for 20% of its stock.

The supplemental Kuller affidavit also quotes a footnote from an annual report issued by Nytronics to its shareholders on December 29, 1969, indicating that in light of the assets to be acquired in exchange for the 650,000 shares of Gulton stock, "independent investment counsellors" were of the opinion that in spite of the decline in the market value of the stock, no permanent impairment had been suffered in the investment value of the shares, which were being carried at their cost of $23,116,000. Subtracting the $5,000,000 to be received by Nytronics in cash, Kuller concludes that Nytronics values the two divisions at approximately $18,000,000, and notes that although the Gulton letter of March 10 does quote from another footnote to the same Nytronics annual report, no reference is made to this valuation. Kuller further points out that in the March 10 letter Gulton's recomputed earnings-per-share figures are given, based on the eleven months ended January 31, 1970, showing that the result of the stock purchase will be a 13% reduction in earnings per share, rather than a 6% increase as concluded in the Lehman Brothers report of November 25.

Plaintiff also relies upon the two reports by "independent investment counsellors" referred to in the Nytronics annual report. The first, a two-page letter from the D. H. Blair Securities Corporation dated December 16, 1969, states that in view of the proposed acquisition of Continental and Sage in exchange for the Gulton shares, "the price of the stock up or down is of little consequence * * * [I]t is our opinion that the 650,000 shares of Gulton Industries common stock owned by Nytronics, Inc. may be fairly valued by Nytronics given its purposes, at the purchase price of $23,-600,000 [sic]." The second is a one-page letter dated December 4 from Fusz-Schmelzle & Co. of St. Louis, stating that as a result of its investigation of the proposed transaction and of the two divisions to be acquired by Nytronics, it was of the opinion that "the shares of the common stock of Gulton Industries, Inc. owned by Nytronics, Inc. may be fairly valued at not less than the original purchase price of $23,600,000 [sic]."

On the assumption that the foregoing evidence, coupled with an absence of any evident business justification for the transaction, establishes a prima facie case of waste of Gulton's assets, plaintiff contends that all but one of the seven Gulton board members who voted in favor of the transaction were motivated by personal considerations. Defendant Walter F. Gips, Jr. is President and a director of Gulton. Robert L. Pelz is Chairman of its Executive Committee, its Secretary, a director, and senior partner in a law firm which continues to represent the company and which received legal fees totalling $98,000 from it during the year ending February 28, 1969. Plaintiff contends that these defendants probably acted out of a desire to retain their positions as officers and directors against the possibility of ouster that might follow sale of the block of 650,000 shares to a third party. No proof is offered, however, in support of this contention.

Plaintiff further suggests that other directors of the company may be motivated by the desire to obtain business from Gulton for other concerns with which they are connected. For instance, William Stott is Executive Vice President and a director of Morgan Guaranty Trust Company, which received $230,057 in interest on short term borrowings from Gulton for the year ending February 28, 1969. F. Warren Hellman is a partner in Lehman Brothers, Gulton's

investment bankers. Clarke Simonds is a partner in G. H. Walker & Co., another firm of investment bankers. Here, as in the case of officers of the company, no proof is offered in support of plaintiff's claim as to motivation. Plaintiff further concedes that James E. Dingman, retired vice-chairman of the board of American Telephone & Telegraph Corp., who voted in favor of the transaction, is a disinterested party.

Defendants not only challenge the extent of the alleged disparity in value between the 650,000 Gulton shares being acquired by it and the consideration to be paid by Gulton, but also contend that their motive and intent was to act in the best interests of Gulton and its stockholders. Defendants contend that New York Stock Exchange quotations, while a relevant gauge and one entitled to considerable weight in valuing smaller blocks of stock, cannot be accepted as a true guideline of the value of such a large block. On oral argument our attention was further directed to the fact that the decline in the stock market per share price of Gulton stock must be attributable, in part at least, to the general slump in the stock market over the past six months rather than to a change in the underlying values behind Gulton stock.

If all 650,000 Gulton shares were offered at once on the stock market, the price would be depressed, with the result that Nytronics would receive substantially less than the value behind the shares. Conversely, if this large block were offered as such, a premium over current market quotations might be commanded, depending on the purchaser's appraisal of the underlying value of the assets, after giving consideration to numerous factors other than stock market prices, including book value, earning power, growth potential, and the possibility of combining with other ventures. In short, stock market prices, particularly in view of the current general slump in the stock market, cannot be accepted as the controlling measure of the value of the 650,000 Gulton shares. This conclusion was even recognized in the letter of D. H. Blair Securities Corp., relied upon by plaintiff, which states that "the price of the stock up or down is of little consequence." Yet plaintiff's thesis is based in major part upon stock exchange quotations which have varied widely over the last six months.

Defendants further rely upon the report of Lehman Brothers, an investment banking concern of competence and repute, regarding Continental's earnings prospects. The Lehman report, unlike the Kuller affidavits, is a dispassionate document. It forecasts a long-range reduction—unquestioned by plaintiff's experts—in sales of Continental's main product, a watertight shipboard cable. The proxy statement, which reflects the views of Gulton's board describes the situation as follows:

"The fluctuations in profits of Continental and Sage resulted principally from two factors which affected Continental's profitability: (1) a substantial industry wide improvement in profit margins during the 1967 and 1968 fiscal years which resulted from a temporary accumulation of demand in excess of production capacity, and (2) unusually high profitability of a watertight shipboard cable during the 1968 and 1969 fiscal years due to limited competition. This cable was first manufactured by Continental in fiscal 1965 and constituted 8% of its sales in that year. The sales contribution increased to 47% in fiscal 1969. In the latter part of that year, a combination of increased competition, lessening of demand and higher manufacturing costs began to erode profitability of this item. The sales contribution receded to 24% during the first half of fiscal 1970."

Lehman Brothers' report further concluded that although Continental's earnings could be expected to recover to some extent (in view of anticipated improvement in sales of its other classes of cable), it was nonetheless "doubtful that

the profit margins realized from 1967 through 1969 will occur again in the near future."

The future earnings of Continental and Sage unquestionably have a profound effect on the value that can presently be attributed to their assets, depending upon the reliability of predictions. Here we are faced with conflicting forecasts on the part of experts with respect to the future earnings of these divisions, and we cannot in the light of that conflict attach any great significance to the substantial increase in earnings experienced by Continental and Sage during the months of December and January, or accept Kuller's predictions as against the apparently conservative estimates of Lehman Brothers. At best we are confronted with conflicting prophecies, with no warranty attaching to either. Neither side has offered any explanation for the recent spurt in earnings on the part of Continental and Sage, which has apparently not been the result of increased sales. During the two-month December-January period the combined net earnings of these divisions produced more than 46% of Gulton's consolidated net earnings for the same period even though the combined net sales of the two divisions amounted to only 11.4% of Gulton's consolidated sales. But there is an inherent danger in accepting such a short period as the basis for determining future earnings, especially when one recognizes that during the 11-month period ending January 31, 1970, Sage and Continental contributed but 10.78% of Gulton's consolidated sales and 15.58% of its consolidated earnings.

We cannot give any appreciable weight to the opinion letters of D. H. Blair Securities Corp. and Fusz-Schmelzle, Inc., which appear to be concerned more with minimizing the significance of the depressed market price upon the value of the Gulton shares—an observation which cuts both ways—than with providing a sound basis in support of plaintiff's contentions. Having paid $35 per share plus warrants for the 650,000 Gulton shares in April 1969 and carried them on its books at $23,600,000, Nytronics would not have been required to adjust its acquisition cost downward to reflect fluctuation in market values, at least until such a write-down was dictated by a permanent decline in value. We can infer that it obtained the opinion letters because it wanted to avoid being required to reduce its asset position substantially as a result of the acquisition of Continental and Sage.

Turning to plaintiff's allegations of selfish motives behind the seven directors' votes in favor of the proposed transaction, defendants do not question the fact that maintenance of stability in the management of Gulton was an important consideration in leading them to vote in favor of consummation of the transaction. They point out that as long as there is the possibility of the 650,000 shares falling into the hands of third parties who might attempt to organize a takeover bid, there will be uncertainty in the minds of those forming the lower and middle echelons on Gulton's management, which will have a demoralizing effect adversely affecting their ability to work toward the company's best interests. We cannot say that it was improper under the circumstances to give substantial weight to preservation of employee morale.

Plaintiff's contention that certain directors acted with a view to personal gain is further offset by other countervailing factors. For instance, if the transaction, as plaintiff contends, would cause substantial harm to Gulton and its shareholders, Howatt, Gips and Pelz, who own 287,000, 25,000 and 4,588 Gulton shares, respectively, should have been inclined to vote against approving the transaction rather than reduce the value of their own substantial equity interests in Gulton. Also, plaintiff's suggestion that some defendants desire to continue their positions as salaried officers is answered by the fact that, according to the proxy statement, only one

of the seven directors in question received an aggregate direct remuneration from the company exceeding $30,000 per year. Such a comparatively modest income is unlikely to have had any significant influence upon their conduct.

We remain equally unpersuaded by plaintiff's suggestions that the professional connections of certain members of the Gulton board might have caused them to throw judgment to the winds in evaluating a corporate transaction like that before us. Boards of directors are deliberately chosen from the ranks of businessmen, bankers and lawyers because of their expertise in evaluating the merits of precisely this sort of proposal. In the absence of any supporting evidence general speculation that such men have here subordinated the interests of the company they serve in a fiduciary capacity as directors to the interests of corporations and firms they serve as employees cannot be given any great weight.

After reviewing the entire record we conclude that the evidence offered by the plaintiff does not make out a case of gross or indefensible disparity, inadequacy or unfairness that would warrant granting preliminary injunctive relief. On the contrary, to grant such relief under the circumstances would in effect be simply to accept the opinion of plaintiff's experts as to the future earnings of Continental and Sage rather than the apparently reasonable opinion of defendants' advisors. In so concluding we do not imply that plaintiff has failed to raise questions concerning the transaction that would warrant trial of the case. We decide only that on the present state of the record he has not made out a sufficiently convincing case to justify the extraordinary remedy of preliminary injunctive relief. Accordingly, the motion is denied.

The foregoing shall constitute the court's findings of fact and conclusions of law as required by Rule 52(a), F.R. Civ.P.

It is so ordered.