**REPUBLIC TECHNOLOGY FUND, INC.,**
etc., Plaintiff,

v.

**The LIONEL CORPORATION,**
Defendant.

**The NEW ENGLAND INDUSTRIES,**
INC., etc., Plaintiff,

v.

**The LIONEL CORPORATION,**
Defendant.

**Nos. 66 Civ. 1523, 66 Civ. 1992.**

United States District Court,
S. D. New York.

June 12, 1972.

Orans, Elsen & Polstein, New York City, for plaintiffs; Sheldon H. Elsen and Lewis Shapiro, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant; James E. Tolan, Judith S. Kaye, Paul D. Freeman, Richard F. Youmans, New York City, of counsel.

## OPINION

BONSAL, District Judge.

These two actions, which were tried together by the court without a jury, arise out of the merger of Hathaway Instruments, Inc., into The Lionel Corporation, which merger became effective on November 6, 1961. Plaintiff in 66 Civ. 1523, Republic Technology Fund, Inc. ("Republic"), was incorporated under the laws of Delaware and has its principal place of business in California. Plaintiff in 66 Civ. 1992, The New England Industries, Inc. ("NEI"), was incorporated under the laws of Connecticut and has its principal place of business in New York. Both plaintiffs are investment funds. The defendant in both actions, The Lionel Corporation ("Lionel"),[1] was incorporated under the laws of New York and has its principal place of business in New Jersey. Plaintiffs are former shareholders of Hathaway, and as a result of the merger of Hathaway into Lionel, received shares of Lionel convertible preferred stock in exchange for their shares of unregistered Hathaway common stock.

The gravamen of plaintiffs' complaints is that Lionel's unaudited Financial Statements for the six-month period ending June 30, 1961, contained in the Hathaway proxy statement on which they relied in exchanging their shares, were materially false and misleading in that they understated Lionel's losses for this period. Plaintiffs sue under Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (b) and Rule 10b–5 promulgated thereunder, and Section 14 (15 U.S.C. § 78n) and Rule 14a–9 promulgated thereunder. Jurisdiction is based on Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v, and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

By way of pendent jurisdiction in both actions and diversity of citizenship in the Republic action, plaintiffs allege that Lionel breached its contractual obligation to register under the Securities Act of 1933 the shares of Lionel preferred stock which they received in exchange for their unregistered shares of Hathaway common stock.

On July 8, 1960, Republic purchased 25,000 shares of the unregistered Hathaway common stock, and on March 15, 1961 purchased 25,000 additional shares. On March 15, 1961, NEI purchased 15,000 shares of unregistered Hathaway common stock.

In June of 1961, Lionel and Hathaway entered into merger negotiations culminating in a merger agreement. The merger became effective on November 6, 1961.

The Agreement of Merger, which was attached to the Hathaway proxy statement as Exhibit A, provided for the "conversion" of the 1,022,727 shares of Hath-

---

1. Lionel is a multi-line corporation which designs, manufactures and markets model electric trains and other toys; electronic instruments and components; radiation detection and measuring devices; missile parts and air-frame sections; and parachutes for recovery and deceleration chutes for jet aircraft. (Plaintiffs' exhibit 17, p. 21.)

away common stock into Lionel 3¾ noncumulative convertible preferred stock at the rate of one share of Lionel preferred for each three shares of Hathaway common. In accordance with the Agreement of Merger, Republic exchanged 50,000 shares of Hathaway common for 16,667 of Lionel preferred, and NEI exchanged 15,000 shares of Hathaway common for 5,000 shares of Lionel preferred.

The Hathaway proxy statement included Financial Statements for both companies as well as pro forma Financial Statements for the merged company. Lionel's Financial Statements included audited financial figures for the five-year period ending December 31, 1960, and unaudited financial figures for the six-month periods ending June 30, 1960, and June 30, 1961. Lionel's unaudited Consolidated Statement of Income for the six-month period ending June 30, 1961, showed a net loss of $107,996 ($.18 per share) as compared with a profit of $655,011 ($.48 per share) for the corresponding period in 1960. The pro forma net income statement for the merged company for the six-month period ending June 30, 1961, showed a net income of $245,311 ($.08 per share).

The loss shown by Lionel for this period was the beginning of a long period of financial adversity. Lionel showed a loss for the year 1961 of $2,532,277; for the year 1962, of $4,871,209; and for the year 1963, of $6,537,525. For the year 1960, Lionel showed a net income of $862,897.

An action was instituted on April 2, 1963, in the New York Supreme Court, which included the plaintiffs and which was a purported class action seeking substantially the same relief here sought. The New York action was dismissed on May 11, 1966, for lack of prosecution. The instant actions were instituted as purported class actions on May 25, 1966 (Republic) and July 6, 1966 (NEI). On November 7, 1966, Judge Weinfeld denied plaintiffs class action status without prejudice. At trial, plaintiffs made no attempt to have the case treated as a class action.

In view of the deteriorating financial condition of Lionel, it is understandable that plaintiffs should seek some way to recoup their loss. Indeed, it may be that Lionel's mounting losses resulted, in part, by mismanagement. However, only Lionel is named as a defendant, so that any recovery from Lionel will be paid out of its assets at the expense of its other stockholders. This makes it essential that the plaintiffs prove their contentions by a fair preponderance of the evidence.

At trial, plaintiffs relied on the expert testimony of Irving L. Duchan,[2] a certified public accountant. Mr. Duchan is a partner in J. H. Cohen and Company, an accounting firm which audits publicly held corporations. Mr. Duchan taught accounting at the School of Business of the City College of New York and has testified on numerous occasions as an accounting expert.

At trial, Lionel relied on the testimony of Kermit Easton, a certified public accountant and a partner of S. D. Leidesdorf & Co. ("Leidesdorf"). Leidesdorf was Lionel's auditor from the early

2. Mr. Duchan testified that he examined the following:
   1. Hathaway Proxy Statement (Pl. Ex. 17)
   2. Lionel Annual Report for 1961 (Pl. Ex. 26)
   3. Registration Statement filed by Lionel Sept. 28, 1961 (Pl. Ex. 60)
   4. S. D. Leidesdorf & Co. work papers, including:
      Lionel six-month adjusting entries (Pl. Ex. 52)
      Lionel June 30, 1961 consolidated statements (Pl. Ex. 53)
      Lionel June 5, 1961 trial balance (Pl. Ex. 54)
      Lionel December 31, 1961 adjusting entries (Pl. Ex. 55)
      Lionel December 31, 1961 consolidated statements (Pl. Ex. 56)
      Lionel December 31, 1961 trial balance (Pl. Ex. 57)
      Summary Lionel year-end adjustments as result of year-end audit or during fourth quarter (Pl. Ex. 58)

1940's when Lionel became a publicly held corporation, until the mid 1960's. Mr. Easton is a member of the faculty of the Northeastern University Center for Management Development, where he teaches corporate financial reporting, has appeared on Practicing Law Institute Panels, and has lectured before the American Management Association. In 1960 Mr. Easton was a managing accountant on the Lionel audit. In 1961 he became the senior managing accountant, and he subsequently became a partner of the firm. Mr. Easton testified both as to his participation in the preparation of the Financial Statements and as an accounting expert.

Plaintiffs contend that Lionel's unaudited financial figures for the six-month period ending June 30, 1961, were false and misleading in that Lionel failed to make necessary adjustments in the following items:

  (1) Inventory

  (2) Sales returns and allowances

  (3) Reserve for bad debts

  (4) Goodwill

  (5) Research and development

  (6) Selling, advertising and service expenses

  (7) Miscellaneous

Mr. Duchan testified that at year-end, Lionel made adjustments in these items for the full year 1961 of over $2,-000,000 [3] and that, in his opinion, a substantial portion of these adjustments should have been reflected in the June 30 Financial Statements.

Lionel's expert, Mr. Easton, disagreed. He testified that, based on his familiar-ity with Leidesdorf's audit for 1961, its participation in the June 30 unaudited Financial Statements and its preparation in April 1962 of the schedule (Pl. Ex. 58) analyzing Lionel's losses for the year 1961, in his opinion the June 30, 1961 Financial Statements were accurate. In Mr. Easton's opinion, the fact that adjustments were made for the entire year did not mean that such adjustments were required in the six-month Statements in view of the seasonal nature of much of Lionel's business. Mr. Easton testified that the June 30 Financial Statements were prepared in accordance with the same generally accepted accounting principles used in its year-end Statements and in its Financial Statements for prior years, and that where Lionel made changes in its accounting procedures, they were reflected in the notes to the Financial Statements.

The court turns to a consideration of the several items as to which plaintiffs contend adjustments should have been made in the June 30 Statements.

### Inventory

Lionel did not take a physical inventory for its June 30 Financial Statements. Instead, Lionel estimated its inventory by adding purchases, direct labor and factory overhead to its December 30, 1960 inventory and deducting therefrom the estimated costs of goods sold (Pl. Ex. 17, pg. F–28, Note C). Mr. Duchan testified that proper interim reporting required that Lionel consider making adjustments to reflect obsolescence, raw material price variance, shrinkage, and unlocated difference between book and physical inventory.[4]

---

3. The following adjustments were recorded as at December 31, 1961:

| | |
|---|---|
| Inventory | $1,466,776 |
| Sales returns and allowances | 106,000 |
| Deferred research and development | 390,000 |
| Deferred selling, advertising and service expenses | 249,000 |
| | $2,211,776 |

4. At year-end, Lionel made inventory adjustments of $726,776. for its Toy and Train Division, and $740,000. for its Electronics Divisions. The adjustments made for the Toy and Train Division were as follows:

| | |
|---|---|
| Obsolescence | $252,830 |
| Raw material price variance | $140,000 |
| Shrinkage | $ 77,946 |
| Unlocated difference between book and physical inventory | $256,000 |

Mr. Duchan testified that on the basis of the industry toy show in March, Lionel should have been able to determine which lines might be "losers" and to make a partial adjustment for obsolescence at June 30. Mr. Easton disagreed, testifying that it was Lionel's experience that less than 10% of its toy sales were related to orders picked up at the March toy show and that this did not provide a sufficient basis for adjusting inventory due to obsolescence. Mr. Duchan could draw no conclusion from the documents which he had examined as to whether or not Lionel should have made an adjustment for obsolescence in the June 30 Statements. (Tr. 206)

As to raw material price variance, it was Mr. Duchan's opinion that by June 30. Lionel would have purchased enough raw materials to make a partial adjustment for raw material price variance. However, there was no evidence presented from which the need of such an adjustment could be determined, or any evidence as to Lionel's raw material purchases during the six-month period.

With regard to shrinkage and unlocated difference between book and physical inventory, while Mr. Duchan suggested that on the basis of prior physical inventories Lionel should have estimated an adjustment for these items as at June 30, Mr. Easton pointed out that the only way to ascertain shrinkage and unlocated difference between book and physical inventory is to take a physical inventory, and plaintiffs do not contend that Lionel should have taken a physical inventory before issuing its June 30 Financial Statements. Mr. Duchan suggested that Lionel had a history of inventory variations in the early part of each year, but there was no evidence to support this suggestion.

Mr. Duchan also suggested that the failure at midyear to make inventory adjustments for the Telerad Division, which had a year-end inventory adjustment of $540,000, resulted in Telerad's showing a profit of $28,000 for the first six months on $480,000 of sales, and a loss of $551,000 for the second six months on $889,000 of sales. Mr. Easton testified that at June 30, Lionel considered Telerad's inventory to be saleable and therefore did not write it down, and that the mere fact that substantial inventory adjustments were made in the second half of the year does not establish that such adjustments were required to be made at June 30.

## Sales Returns and Allowances

At year-end, Lionel made adjustments for sales returns and allowances in the amount of $54,000 for the Toy and Train Division, and $52,000 for the Airex Division. Mr. Duchan thought that part of these adjustments should have been made in the June 30 Statements, particularly with respect to Airex, which Mr. Duchan believed had a different seasonal pattern than the Toy and Train Division. However, Mr. Easton pointed out that on the books of Lionel, sales returns and allowances were entered when they occurred and were matched against the sales out of which they arose. The Airex sales returns and allowances reflected in the year-end adjustment related to sales of sporting goods imported from Japan which were sold during the Christmas season of 1961. Therefore, because of the seasonal (Christmas) nature of the business of both divisions in 1961, most of the sales returns and allowances were made in early 1962 and reflected in the 1961 year-end Statements. For the same reason, most of the sales returns and allowances during the first six months of 1961 would have been reflected in the 1960 year-end Statements.

## Reserve for Bad Debts

At June 30, Lionel showed a reserve of $72,000 for "Doubtful Accounts" against Accounts Receivable of $3,312,-000 (2.1%), whereas for the year 1961, Lionel showed a reserve of $315,000 for "Doubtful Accounts, Discounts, Returns and Allowances" against $3,649,000 of Accounts Receivable (8.5%). Mr. Duchan suggested that the difference in the reserve indicated that the reserve made at June 30 was inadequate. Mr. Easton

again disagreed, stating that on the basis of Leidesdorf's experience as Lionel's auditor and the discussions Leidesdorf personnel had with Lionel personnel, Leidesdorf was satisfied that the June 30 reserve was adequate. He pointed out that the two reserves were not comparable since the year-end reserve included discounts, returns and allowances as well as doubtful accounts.

### Goodwill

Lionel's audited Balance Sheets for the years ending December 31, 1960, and December 31, 1961, contained an item, "Excess of Cost of Acquisition of 40,000 Shares of Common Stock of Anton-Imco Electronics Corp. Over Underlying Book Amount at Date of Acquisition . . . $998,076." It was agreed that this item represented the goodwill of Anton-Imco. The same figure, $998,076, was included in Lionel's unaudited Balance Sheet for June 30, 1961. Mr. Duchan noted that Anton-Imco showed an operating loss of $189,000 at June 30, 1961, and was of the opinion that the goodwill item should have been written down. It appears that Anton-Imco was acquired by Lionel in 1960, and at June 30, 1961 was developing a currency recognizing device. In Lionel's opinion, the prospects of success of this device warranted no diminution in the goodwill item, and Mr. Easton testified that at the end of the year 1961, while a write-down was discussed, Leidesdorf agreed with Lionel that no reduction need be made, although Anton-Imco showed a year-end loss of $724,000.

### Research and Development

At year-end, Lionel wrote off $390,000 of deferred research and development expenses on projects which no longer had any commercial value. Mr. Duchan suggested that Lionel arbitrarily waited until year-end to review research and development projects and, in view of the year-end adjustments, was of the opinion that as at June 30 an adjustment was called for. Mr. Easton testified that Lionel reviewed its research and development projects as at June 30. When Leidesdorf made the year-end audit, they found nothing to indicate that an adjustment for research and development should have been made as at June 30. Mr. Duchan pointed out that Lionel changed its policy, for financial reporting purposes, with respect to treatment of engineering and design costs in the year 1960 and that, had it not done so, a greater loss would have been shown in the June 30 Financial Statement. However, as pointed out by Mr. Easton, this fact was fully disclosed in Note J to the June 30 Financial Statements.

### Selling, Advertising and Service Expenses

The June 30 unaudited Balance Sheet showed, in "Deferred Charges", an item for selling, advertising and service expenses deferred, in the amount of $449,245, which item was eliminated in the year-end Statement. A schedule prepared by Leidesdorf in April, 1962 (Pl. Ex. 58) shows an item of $249,000 as "[d]eferred selling, advertising and service expenses deferred as at September 30, 1961, which should have been expensed at September 30, 1961, if the budgeted sales and expense used in the September 30, 1961, computation of the deferral were actual sales and expense for the year 1961." Mr. Duchan thought that at least part of the $249,000 should have been expensed at June 30, 1961, and would have been if Lionel had considered whether actual sales were running less than projected sales. The issue raised is whether the relationship between Lionel's actual sales and projected sales warranted it carrying the $449,245 figure as at June 30. Mr. Easton testified that on the basis of discussions with Lionel personnel and its own review for reasonableness, Leidesdorf was satisfied that as at June 30 Lionel's actual and projected sales were in line and its sales projections were reasonable. Mr. Easton further testified that the disparity between actual and projected sales did not arise until after September.

*Miscellaneous*

There was evidence as to several small items which plaintiffs allege were reflected in the June 30 Financial Statements and which involved the question as to whether they related to the six-month period ending June 30, 1961, or whether they related to a different accounting period. There was some difference of opinion between Mr. Duchan and Mr. Easton on these items [5] but, in any event, they would not have materially changed the overall picture and there is no showing that any of them involved a material misrepresentation.

■ Plaintiffs have not established by a fair preponderance of the evidence that the June 30 Financial Statements were materially false or that Lionel omitted to state any material fact necessary to make the Statements not false or misleading. See Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 799 (2d Cir. 1969); Abramson v. Nytronics, Inc., 312 F.Supp. 519, 524 (S.D.N.Y.1970); Richland v. Crandall, 262 F.Supp. 538, 552 (S.D.N.Y.1967).

While Mr. Duchan was of the opinion that adjustments should have been made in the Lionel June 30 Financial Statements, he could not indicate the amount of these adjustments. Therefore, if in fact any adjustments were required, the court has no basis for finding "whether the fact[s] claimed to have been misstated or omitted [were] of such a nature that it could normally be expected to lead a reasonable stockholder [of Hathaway] not to vote in favor of the [merger] proposal . . . ." Richland v. Crandall, *supra* at 553; Mills v. Electric Auto-Lite, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Crane Co. v. Westinghouse Air Brake Co., *supra*. While it is true, as contended in plain-

tiffs' brief, that approximately $30,000 of adjustments would have decreased the pro forma combined net income of Lionel and Hathaway from 8¢ per share to 7¢ per share, the Hathaway stockholders would have looked primarily to Lionel's Financial Statements in considering the merger proposal.

The Lionel six-month income statement which plaintiffs charge was false and misleading shows a net loss of $107,996 as against net income for the comparable period in the year 1960 of $655,011. There was no evidence that the accounting principles followed in the preparation of the six-month statement for 1961 differed from those followed in the preparation of similar statements for 1960 or prior years. Clearly, within this context plaintiffs have failed to carry their burden of proof as to materiality. Compare Bowman & Bourdon, Inc. v. Rohr, 296 F.Supp. 847 (D. Mass.1969), aff'd, 417 F.2d 780 (1st Cir. 1969).

■ Mr. Easton's testimony satisfied the court that the Lionel personnel who prepared the June 30 Financial Statements with the assistance of Leidesdorf did not know (nor should they have known) that the Statements were false or misleading, and there is no evidence to show that Lionel sought to perpetrate a fraud in preparing the Statements for use in Hathaway's proxy statement. Granting a difference of opinion between Easton and Duchan as to the accounting principles involved, the court can make no finding of any form of scienter on the part of Lionel. See Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290 (2d Cir. 1969); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 868 (2d Cir. 1968); Astor v. Texas

5. These items are:
  1. $51,369 included as other income in Lionel's Consolidated Statement of Income for the six-month period ending June 30, 1961.
  2. $24,000 for sales returns shown as a credit on Lionel's trial balance as at June 30, 1961.

  3. $19,233.68 for cooperative department store advertising expenses shown as a credit on Lionel's trial balance as at June 30, 1961.
  The evidence does not show how items 2 and 3 were reflected in the Financial Statements, if indeed they were.

Gulf Sulphur Co., 306 F.Supp. 1333, 1343 (S.D.N.Y.1969). Indeed, the evidence is to the contrary.

■ The instant case is clearly distinguishable from Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838 (2d Cir. 1952). There, the Court of Appeals found that Kaiser-Frazer represented that it had earnings of about $4,000,000 in December, 1947, when in fact its earnings for that month were only $900,-000, the difference being accounted for by an inventory write-up made by the company which should have been allocated over prior periods as well as December in determining the December earnings. Therefore, the court held that the Statement of December earnings was untrue on the basis of the facts known to the company at the time it was made. There is no evidence here that the Lionel June 30 Financial Statements were untrue on the basis of facts known to Lionel at the time they were made.[6]

### Contract Issue

On July 8, 1960, Republic purchased 25,000 shares of unregistered common stock of Hathaway at a price of $20.75 a share. The contract provided that if at any time after 12 months from the date of the contract Republic should determine to register its Hathaway stock under the Securities Act of 1933, Hathaway would use its "best efforts" to register the stock at Republic's expense, and Hathaway covenanted that the Registration Statement would comply with Section 10 of the Securities Act and would not include any false statements or fail to state material facts.

On March 15, 1961, Republic purchased 25,000 additional unregistered shares of Hathaway stock, and NEI purchased 15,000 shares of Hathaway unregistered common stock. In the letters covering these sales, Hathaway represented that it intended to file a Registration Statement on or before May 15, 1961 covering its convertible subordinated debentures and the common stock issuable upon conversion of these debentures. Hathaway agreed that it would use its "best efforts" to include in the Registration Statement the shares acquired by Republic and NEI "to the end" that their shares would be registered and the Registration Statement would remain effective for a period of not less than 24 months. On March 27, 1961, Republic wrote Hathaway that it would appreciate having all its shares registered. On May 5, 1961, Hathaway filed a Registration Statement with the Securities and Exchange Commission ("SEC") covering its debentures and its common stock (including plaintiffs' shares).

Hathaway commenced negotiations for a merger with Lionel. On June 8, 1961, (having obtained the consent of a majority of its debenture holders) Hathaway asked the SEC for permission to withdraw its Registration Statement because of the pending merger. The SEC withheld such permission until after September 28, 1961, on which date Lionel filed a Registration Statement which included the shares of Lionel preferred stock which would be issued in exchange for the unregistered shares of Hathaway common stock. The merger between Hathaway and Lionel originally contemplated an exchange of Lionel common for Hathaway common but after considerable negotiation the final Agreement of Merger provided for the ex-

---

6. In addition to alleging violations of Section 17 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, plaintiffs allege a violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 promulgated thereunder. Since Hathaway's common stock was not registered under Section 12 of the Securities Exchange Act of 1934, the Hathaway proxy statement was not subject to Section 14 and Rule 14a–9 of the Act. Moreover, plaintiffs have failed to establish by a fair preponderance of the evidence that the proxy statement was materially false or that it omitted material facts necessary to make the statement not false or misleading.

change of Lionel preferred for Hathaway common.

Hathaway merged into Lionel pursuant to an Agreement of Merger dated as of September 15, 1961, which was executed by the parties on October 19, 1961, and approved by the stockholders of both companies on October 25, 1961. As a result of the merger, Lionel succeeded to Hathaway's obligations to the plaintiffs insofar as they remained applicable. In addition, Article XIV of the Agreement of Merger provided that Lionel would file a Registration Statement with the SEC on or before October 15, 1961 covering Hathaway's debentures and the common stock into which such debentures could be converted and "such other of its [Hathaway] $1.00 par value common stock as Hathaway may by previous agreement be legally obligated to register."

The history of Lionel's Registration Statement, which was originally filed with the ·SEC on September 28, 1961, was testified to in detail by Peter E. Panarites, whose Washington, D. C. law firm represented Lionel. The work was done at Lionel's direction and included, in the first instance, the preparation of an S–1 Registration Statement (covering debentures, preferred and common stock) and a proxy statement for Lionel in connection with the Hathaway merger. In July, Panarites' firm was instructed to stop work as there had been a hitch in the merger negotiations. Four weeks later, after the merger deal was changed from common for common to preferred for common, Panarites' firm resumed work on both the S–1 and the Lionel proxy statement. The Lionel proxy statement was filed in August and cleared by the SEC in September, 1961. The S–1 Registration Statement was filed on September 28, 1961, it being contemplated that a number of amendments would be required in connection with the Financial Statements and to reflect the final merger terms. Panarites' firm undertook to obtain detailed information as to the Hathaway stockholders who intended to sell their shares

when the registration became effective. It also became necessary to file third-quarter financials. Amendment No. 1 to the S–1 was filed on December 19, 1961, and in January, 1962 the SEC submitted a list of comments which required a second Amendment. While work was proceeding on Amendment No. 2, it appears that Lionel's year-end losses for 1961 made it necessary to include year-end 1961 Financial Statements. Following conferences with the SEC, Lionel agreed to furnish audited year-end figures for 1961. The Hathaway stockholders were advised accordingly.

The Lionel year-end 1961 audit was completed on or about March 15, 1962. The audit of the Hathaway figures took some time because of the number of auditors involved. Lionel's Amendment No. 2 to its S–1 was filed in May and included first quarter unaudited financials. Thereafter, further communication was had with the Hathaway stockholders to determine their intent to sell. The SEC reported its comments on July 5 and requested a comparative earnings statement for the first six months of 1961 and 1962, which was completed during August. Amendment No. 3 to the S–1 was filed on September 14, 1962, and the Lionel S–1 became effective on September 21, 1962.

During early 1963 it appeared that Lionel had suffered another substantial loss in 1962, and it was determined to suspend sales under the Registration Statement and Prospectus until year-end audited financials for the year 1962 could be furnished. The effectiveness of the Registration Statement was suspended in March, 1963. At this point, Lionel was impaled on the horns of a dilemma. The SEC required certified 1962 year-end Financial Statements. Leidesdorf, Lionel's auditor, was unable to certify these Financial Statements because in its opinion Lionel, as a result of its losses, had breached certain restrictive covenants in the agreement under which its debentures were issued, which required a consolidated working capital of not less than 125% of its con-

solidated funded debt. As at December 31, 1962, there was a deficiency of approximately $1,200,000 in the required consolidated working capital. In addition, Leidesdorf was aware that on April 2, 1963, an action had been instituted in the State court against Lionel on behalf of the holders of its preferred stock, alleging that Hathaway, and later, Lionel, had breached their contractual obligations to file a Registration Statement, and that there were violations of the Securities Act and the Securities Exchange Act committed in connection with the Hathaway proxy statement. The New York action, which it is stated was instituted by the plaintiffs here, was dismissed on May 11, 1966, by Justice Silverman for lack of prosecution.

Mr. Panarites testified that, following the suspension of the Registration Statement, his firm undertook negotiations with the SEC with the view to obtaining "no action" letters for those former Hathaway stockholders who wished to sell their Lionel preferred stock.

Plaintiffs contend that Lionel breached its contractual obligations on three grounds:

"1. Lionel did not comply with its obligation under Article XIV of the Agreement of Merger because the only registration statement for the registration of plaintiffs' stock which it filed before October 15, 1961 was materially defective, in that it contained materially misleading financial information (the interim figures of June 30, 1961).

"2. Lionel did not cause a registration statement to become effective with respect to plaintiffs' stock within a reasonable time.

"3. Lionel did not maintain effective registration for plaintiffs' stock for 24 months, within the meaning of Hathaway's March 15, 1961 covenant, to which Lionel succeeded."

The first ground has already been disposed of because the court has found that the June 30, 1961 Statements were not materially misleading.

■ With respect to the second ground, both Hathaway and Lionel filed Registration Statements within the time they were obliged to do so. Hathaway agreed to file a Registration Statement on or before May 15, 1961, and filed the Statement on May 5, 1961. The reason for withdrawing this Statement was the merger with Lionel, of which plaintiffs were fully aware, and in which they participated by exchanging their Hathaway common stock for Lionel preferred. Article XIV(b) of the Agreement of Merger required Lionel to file a Registration Statement on or before October 15, 1961, and Lionel filed the Registration Statement on September 28, 1961, which became effective on September 21, 1962.

In view of the financial problems hereinabove referred to and the testimony adduced at the trial, plaintiffs have not established that the Lionel Registration Statement and Prospectus did not become effective within a reasonable time. Plaintiffs' expert, Mr. Friedman, conceded that he had known of situations where Registration Statements never became effective even though those preparing them were diligent and competent (Tr. 304–305). Mr. Panarites' testimony indicates that he and his firm were diligent and competent, and he testified that Lionel was at all times cooperative in furnishing information as required.[7]

■ As to the third ground, on March 15, 1961, Hathaway agreed to use its

7. In their brief, plaintiffs rely on Kupferman v. Consolidated Research & Mfg. Corp., 53 F.R.D. 387 (S.D.N.Y.1971) for the proposition that in the spring of 1961 "it would have taken only some six weeks after filing for a registration statement to become effective." On the contrary, Judge Levet found (Finding 32) that it would have taken a *minimum* of six weeks to prepare and file a post-effective amendment, and an *additional six weeks* for the SEC to review the amendment and declare it effective. Of course, if the SEC requested an additional amendment, as here, more time would be required.

"best efforts" to the end that plaintiffs' Hathaway shares would be registered and the Registration Statement would remain effective for a period of not less than 24 months. Assuming, *arguendo*, that this obligation under the Agreement of Merger applied to plaintiffs' Lionel preferred shares, Lionel's obligation was only to use its "best efforts". It did not promise plaintiffs that the Registration Statement and Prospectus would remain effective for 24 months. Plaintiffs' expert, Mr. Friedman, testified that the term "best efforts" means that:

> "the person obligated to prepare and file the registration statement will set to work diligently and competently to do everything that would have to be done to make the registration statement effective so that in the normal course of events his best efforts would produce effectiveness, the best efforts, in my judgment, being limited only by external causes over which the person preparing the registration statement would have no control."

Defendant's expert, Mr. Panarites, testified, in part: "Best efforts, as far as I am concerned, imposes a requirement that the registration statement not be permitted to lie fallow at the SEC."

Here, "best efforts" was to be directed to maintaining the effectiveness of the Registration Statement and Prospectus for 24 months. The failure to maintain the effectiveness of the Registration Statement and the Prospectus was due to Leidesdorf's unwillingness to certify the necessary Financial Statements because of Lionel's accumulating losses and the institution of the New York lawsuit. This determination of Leidesdorf was beyond Lionel's control. Of course, had not Lionel suffered heavy losses during the period, it would not have been in the dilemma in which it found itself. If such losses were due to mismanagement, plaintiffs may have a remedy against the company and its officers and directors. However, on the evidence, it cannot be said that Lionel failed to use its best efforts to continue the effective-

ness of the Registration Statement and Prospectus for a period of 24 months.

Since the court concludes that plaintiffs have failed to prove their case on the merits, it does not reach the defenses of laches, estoppel, abandonment and the statute of limitations.

The foregoing constitutes the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

The Clerk may enter judgment dismissing the complaints with costs.

It is so ordered.