Louis KLAMBERG, Individually and on behalf of all other persons who were beneficiaries of the Sandler of Boston Profit-Sharing Retirement Plan and Trust after April 1, 1969, Plaintiff,

v.

Chester ROTH, Albert P. Slaner, Norman A. Jackson, Harold Glasser, Robert H. Zimring and Kayser-Roth Corporation, Defendants.

No. 75 Civ. 1507 (JMC).

United States District Court,
S. D. New York.

June 22, 1979.

Barrack, Rodos & McMahon, Philadelphia, Pa. (Donald Barrack, Philadelphia, Pa., and Milberg, Weiss, Bershad & Specthrie, New York City, of counsel), for plaintiff.

Parker, Auspitz, Neesemann & Delehanty, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City (John M. Delehanty, and Robert L. Laufer, New York City, of counsel), for defendant Kayser-Roth Corp.

D'Amato & Lynch, New York City (Robert E. Meshel, and Andrew R. Simmonds, New York City, of counsel), for the individual defendants.

## MEMORANDUM AND ORDER

### CANNELLA, District Judge:

Motion by defendants, for summary judgment on Claims I and II of the complaint for failure to state a claim under the federal securities laws, is granted. Fed.R.Civ.P. 12(b)(6), 56.

Motion by defendants, to dismiss the remaining state law claims for lack of jurisdiction over the subject matter, is denied. Fed.R.Civ.P. 12(b)(1).

Motion by defendants, for summary judgment on Claim VI for failure to state a claim under state law, is denied. Fed.R. Civ.P. 12(b)(6), 56.

Motion by defendant Robert Zimring, for summary judgment, is denied. Fed.R. Civ.P. 56.

Motion by plaintiff, for an Order certifying this action as a class action, is granted. Fed.R.Civ.P. 23.

Jurisdiction is based on the federal securities laws, 15 U.S.C. §§ 77v, 78aa, diversity of citizenship, 28 U.S.C. § 1332(a), and the doctrine of pendent jurisdiction.

## FACTS

Most of the pertinent facts have been related in an earlier opinion in this case, see 425 F.Supp. 440 (S.D.N.Y.1976); nevertheless, a recitation will be useful here. For the purposes of these motions, the Court has treated the facts alleged in the complaint as true, and drawn all reasonable inferences from the complaint, as well as from any uncontroverted evidence, in favor of the plaintiff. See, e. g., Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

In 1953, the A. Sandler Company ["Sandler"] executed an "Agreement" which created the "Sandler of Boston Profit Sharing Retirement Plan and Trust" ["the Trust"], a non-contributory pension plan intended by Sandler to qualify for tax exemption under section 165(a) of the Internal Revenue Code of 1939.[1] The Agreement provided for a committee of three persons ["the Committee"], at least one of whom had to be a beneficiary, to administer the retirement plan and make investment decisions for the Trust.[2] Sandler retained the power to appoint and remove Committee members, with or without cause, and the Agreement

---

1. The current version of this statute is codified at I.R.C. §§ 401, 501.

2. Although the Agreement also provided for persons called "Trustees," these were not trustees in any legal sense. At best, they were agents of the Committee; at worst, they were mere ciphers. The Agreement vested all power to manage the Trust assets in the Committee:

 The Committee shall have full charge of the administration of this Plan and the investment and reinvestment of and disburse-

ments from the Trust Fund and the income thereof. In order to discharge its duties in connection therewith, the Committee shall have the following powers, which are in addition to any other powers elsewhere herein conferred thereon, and not by way of limitation:

 . . . . .

 (b) To direct the Trustees, at any time and from time to time, concerning the investment and reinvestment of the Trust Fund and the

expressly permitted the Committee to invest the assets of the Trust in Sandler stock.[3] In addition, the Agreement required the Committee to furnish each beneficiary with an annual statement of the

> income thereof and all payments and distributions therefrom.
>
> (c) To direct the Trustees to exercise any other powers conferred upon them under the provisions of the Trust herein contained.
>
> . . . . .
>
> (e) To interpret and construe this instrument and to determine all disputes arising hereunder.
>
> (f) Every other power necessary or appropriate to the administration of this Plan and Trust and to effectuate the purposes thereof.

Complaint, Exhibit A, § 8.08. It gave the Trustees what appear to be purely ministerial duties:

> The Trustees shall invest and reinvest the Trust Fund in such securities and other property as the Committee shall from time to time direct in writing, notwithstanding that any such investment may not be authorized for Trustees under statute or rule of law, and without any limitations as to the amount or proportion of the Trust Fund that may be invested in any class of property or in any individual property or security.

*Id.* § 9.11.

The complaint speaks mostly about alleged misconduct by the defendants as "Trustees." In accord with principles of liberal construction, the Court presumes that, where it would favor the plaintiff, he meant to say "Committee members."

3. On October 13, 1954, various sections of the Agreement were amended to conform to changes in the tax laws. As amended, section 9.12 provided:

> Subject to the provisions of Sections 8.08(b) and 9.11 relative to "Prohibited Transactions", the Trustees shall, at the direction of the Committee, and to the extent so directed, but in no event without prior notice and information to and the approval of the Commissioner of Internal Revenue, invest the Trust Fund in the capital stock or other securities of the Company, provided that the Company is in sound financial condition, and at prices not in excess of the fair value of such securities.

Complaint, Exhibit B, § 9.12. As amended, section 8.08(b) provided:

> [The Committee's investment] powers may be exercised by the Committee without previous application to or subsequent ratification by any court or tribunal, and may be exercised without being bound as to the character of any investment by any statute, rule of law or custom governing the investment of trust funds, nor by any limitations as to the

value of his or her interest, and it gave each beneficiary the right to inspect a copy of the Agreement and all later amendments, as well as annual reports concerning investment transactions of the Trust fund.

> amount or proportion of the Trust Fund that may be invested in any class of property or in any individual property or security; *provided, however,* that the Committee may not direct the Trustees to engage in or invest in any "Prohibited Transactions", as the same are defined in Section 503(c) of the Internal Revenue Code of 1954, or to make any other investment which is either forbidden by law or will result in loss to the Trust of its exemption from Federal taxation of its income.

*Id.* § 8.08(b). Concomitantly, section 9.11 was amended to incorporate the proviso regarding "Prohibited Transactions."

Section 503(b) of the current Internal Revenue Code (which was until 1969 designated § 503(c) ) defines "Prohibited Transaction" as any transaction in which an organization subject to the provisions of this section—

> (1) lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest, to;
>
> (2) pays any compensation, in excess of a reasonable allowance for salaries or other compensation for personal services actually rendered, to;
>
> (3) makes any part of its services available on a preferential basis to;
>
> (4) makes any substantial purchase of securities or any other property, for more than adequate consideration in money or money's worth, from;
>
> (5) sells any substantial part of its securities or other property for less than an adequate consideration in money or money's worth, to; or
>
> (6) engages in any other transaction which results in a substantial diversion of its income or corpus to;

> the creator of such organization (if a trust); a person who has made a substantial contribution to such organization; a member of the family (as defined in section 267(c)(4) ) of an individual who is the creator of such trust or who has made a substantial contribution to such organization; or a corporation controlled by such creator or person through the ownership, directly or indirectly, of 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation.

I.R.C. § 503(b). The term "organization" includes a qualified pension trust. *See* I.R.C. § 503(a)(1)(C).

In the event of a merger, consolidation, or sale of the assets of Sandler, the Agreement permitted Sandler's successor either to allow the Plan to terminate, in which case the Committee would distribute the Trust assets, or, to adopt and continue the Plan, in which case it would assume all the powers and duties of Sandler under the Agreement. Sandler, or any successor that adopted the Plan, had the power to amend the Agreement, as well as the power to terminate the Plan and Trust at any time, in its sole discretion.

The plaintiff in this action, Louis Klamberg, became an employee of Sandler in 1945 and a member of the Plan at its inception in 1953. He subsequently received annual statements of his interest in the Trust assets as well as announcements of amendments to the Plan that had been adopted by Sandler. By early 1969, the total value of the Trust assets was approximately $1 million, and the total value of Klamberg's interest, approximately $100,000.

On April 1, 1969, defendant Kayser-Roth Corporation ["Kayser-Roth"] acquired all of the stock of Sandler. Shortly thereafter, although it continued to operate Sandler as a separate entity, Kayser-Roth had the Committee members removed and replaced by the individual defendants Jackson, Zimring, and Roth, who were at the time "control persons," or "insiders" of Kayser-Roth. The Committee then invested $724,000, or about 70%, of the Trust assets in Kayser-Roth stock. The complaint does not state precisely when the Committee made these purchases.

None of the defendants ever told the beneficiaries: (1) that the former Committee members had been removed, or that they had been replaced by Kayser-Roth insiders; (2) that $724,000 (or, for that matter, any amount) of the Trust's assets had been invested in Kayser-Roth stock; or (3) any other information in their possession concerning Kayser-Roth stock. Each beneficiary continued to receive from the Committee one-sentence annual statements of the value of his or her interest.

On February 13, 1970, the defendants Glasser, Jackson, Roth and Slaner met as the Sandler Board of Directors, of which they constituted a quorum. At that meeting they amended the Plan to freeze membership and discontinue company contributions as of November 1, 1968. Simultaneously, they provided for the participation of Sandler employees in the Kayser-Roth Employee Retirement Plan as of November 1, 1968. On May 29, 1970, each Sandler employee received a letter from the company stating, *inter alia*:

> We are pleased to announce that, effective as of November 1, 1968, each of you who was a member of . . . [the Sandler Plan] on October 31, 1968, will become a member of the Kayser-Roth Corporation Employees' Retirement Plan, provided that you are still employed by the Company. . . .

. . . . .

> The [Sandler Plan] is to continue in existence but membership is to be frozen as of October 31, 1968 and no further contributions are to be made to the Plan. Your interest, if any, in the Plan will be fully-vested and distribution will be made to you at the time you attain your normal retirement date. The assets of the Plan are to be invested by the Trustees appointed by the Board of Directors of the Company and your interest will increase or decrease according to investment success with no guarantee of performance.[4]

Klamberg and the other beneficiaries took no action with respect to the Trust's investment in Kayser-Roth stock. The complaint alleges that they were "induced" not to act by the defendants' nondisclosures, but fails to specify what they would have done had they known the material facts.

Klamberg retired in early 1974, at which time the value of his interest in the Trust was approximately $55,000; the value of all the Trust assets at that time was approxi-

---

4. Affidavit of Jonathan M. Plasse, Exhibit F (filed April 4, 1978).

mately $500,000. The decrease occurred primarily because the Kayser-Roth stock had declined in value from $724,000 in 1969 to $210,000 in 1974. Klamberg has brought this action individually and on behalf of all other persons who were beneficiaries of the Trust on April 1, 1969.

Of the six claims contained in the complaint, only two raise federal questions. Specifically, Claims I and II allege violations of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission thereunder. Claims III, IV and V allege breaches of common law fiduciary duties by the individual defendants. Claim VI alleges that the defendants breached the Agreement when they retroactively amended the Plan without terminating it. Jurisdiction over the latter four claims is based on diversity of citizenship and the doctrine of pendent jurisdiction.

Klamberg has now moved, under Rule 23 of the Federal Rules of Civil Procedure, for an Order certifying this action as a class

action. The individual defendants have collectively cross-moved for summary judgment on Claims I and II, for failure to state a cause of action under the federal securities laws, and on Claim VI, for failure to state a cause of action under state law. Also, the defendants contend that the Court lacks subject matter jurisdiction over the state law claims.[5] In a separate motion, the defendant Robert Zimring moves for summary judgment, claiming that he cannot be held legally liable because his duties with respect to the Trust were purely ministerial.

### SECURITIES LAW CLAIMS

The claims under section 10(b)[6] and Rule 10b–5[7] must be dismissed for failure to allege conduct that was materially deceptive or manipulative. In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court ruled decisively that "deceptive" or "manipulative" conduct is a requisite of a Rule 10b–5 cause of action. The Court defined "manipulative" as a "term of art" that refers to various practices, none of which are involved here.[8]

---

5. The defendants' objections to diversity jurisdiction are rendered moot by the Court's decision to certify this action as a class action, and hence need not be further discussed.

6. Section 10(b) of the Securities Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

7. Rule 10b–5 of the Securities and Exchange Commission provides:

> It shall be unlawful for any person, directly, or indirectly, by the use of any means or instrumentality of interstate commerce, or of

the mails, or of any facility of a national securities exchange,

> (a) to employ any device, scheme or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1979).

8. "Manipulation" is "virtually a term of art when used in connection with securities markets." The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

430 U.S. at 476, 97 S.Ct. at 476 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

■ Although the Court did not elaborate on the meaning of "deceptive," it can be fairly inferred that no special term of art was intended. *Webster's New International Dictionary* (2d ed. 1934) defines "deceive" as, *inter alia*: "to cause to believe the false, or disbelieve the truth."[9] "Deceptive" means "tending to deceive; having the power to mislead; as, a deceptive appearance." *Id.* "To deceive," then, refers to the *effect* of conduct on the observer; "deceptive," on the other hand, refers more to a *quality* of the conduct itself, to wit, its *propensity* to deceive.[10] Of course, any estimation of that propensity requires some reference to an observer. We may label something "deceptive," meaning deceptive generally, if it would tend to deceive most any ordinary observer. Nevertheless, something that is not deceptive generally may yet be labelled "deceptive" if it would tend to deceive a particular person or class of persons.[11] This distinction is especially significant for appraising omissions—failures to act or disclose—for whereas false statements or partial disclosures may be deceptive generally, mere silence is deceptive only to persons with particular reasons to draw specific inferences from it.[12]

■ In 10b–5 cases, whether conduct may "fairly be viewed as deceptive" will generally depend upon the circumstances of the particular person or class allegedly deceived, their knowledge and perceptive faculties. In other words, before the court can ask "Was the conduct deceptive?", it must first ascertain "To whom?" Since a 10b–5 action requires a causal connection between the defendant's violation and the plaintiff's loss,[13] the allegedly deceived observers will have to be persons who were in a position to make a decision that led to that loss. Such a decision will often be whether to purchase or sell securities, but may also include a proxy vote,[14] a decision to seek an injunction,[15] or even whether to retire from active employment.[16]

In the instant case, the persons in positions to decide to purchase and sell securities on behalf of the Trust were the Committee members. But these are the very persons charged with perpetrating the fraud, and certainly, it makes no sense to require the plaintiff to show that they were deceptive to themselves. By way of analo-

---

9. *Webster's New International Dictionary* (2d ed. 1934) provides one other arguably applicable definition of deceive: "to impose upon; to deal treacherously with; cheat." This definition, however, is inconsistent with the Supreme Court's holding in *Santa Fe, supra.*

10. *Cf.* Project, *Recent Developments in Securities Law*, 26 Buffalo L.Rev. 503, 579–80 (1977).

11. The oft-quoted observations attributed to our nation's sixteenth President come readily to mind.

12. *See generally* W. Prosser, *Handbook of the Law of Torts* § 106 (1971). *See also Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).
 Rule 10b–5 does not expressly prohibit mere silence. Subdivision (b) refers to partial disclosure. Subdivisions (a) and (c) may perhaps prohibit mere silence, provided such silence may fairly be viewed as deceptive or manipulative.

13. *See, e. g., Santa Fe, supra*, 430 U.S. at 474 n. 14, 97 S.Ct. 1292; Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green*, 91 Harv.L.Rev. 1874, 1884–86 (1978).

14. *See, e. g., SEC v. Parklane Hosiery Co.*, 558 F.2d 1083, 1088 (2d Cir. 1977) (proxy statement seeking shareholder approval for "going-private" merger).

15. *See, e. g., Goldberg v. Meridor*, 567 F.2d 209, 220–21 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), *on remand*, 81 F.R.D. 105 (S.D.N.Y.1979).

16. *See Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F.2d 532, 537–38 (3d Cir.), *cert. denied*, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976). *See also Goodman v. Epstein*, 582 F.2d 388, 412–14 (7th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) (whether limited partners should continue capital contributions to limited partnership or attempt to bring about its dissolution).
 In *O'Brien v. Continental Illinois Nat'l Bank & Trust Co.*, 593 F.2d 54 (7th Cir. 1979), however, the Seventh Circuit took a much more restrictive view, suggesting that the person allegedly deceived had to have been in a position to make an "investment decision," which it defined as a "decision whether to purchase or sell a security." *Id.* at 60.

gy, in a stockholders derivative action [17] for a securities fraud perpetrated upon the corporation by outsiders, the plaintiff must ordinarily show conduct deceptive to the agents authorized to purchase or sell securities for the corporation, usually the officers or directors.[18] But where the plaintiff alleges fraud perpetrated by the directors themselves, "it is surely not necessary to show that the directors deceived themselves. It must be enough to show that they deceived the shareholders, the real owners of the property with which the directors were dealing." [19] Alternatively, it may be possible to show conduct that was deceptive to the corporation itself, albeit to none of the directors.[20] Of course, what is involved here is not a corporation, but a trust of sorts, and an uncritical grafting of concepts developed to apply to the relationship among a corporation, its directors and officers, and its shareholders, to a case involving the relationship among a trustee, the trust property, and the beneficiaries, is not likely to bear lasting fruit.

*Deception of Beneficiaries*

■ Although trust beneficiaries will rarely have to vote on anything, they can often have their trustees enjoined from engaging in disputed securities transactions. Since courts view trusts as "creatures of equity," they are less hesitant to enjoin trustees than they are to enjoin corporate directors.[21] Consequently, where a beneficiary is in a position to decide whether to seek to enjoin his trustee's impending purchase or sale of securities, it would be anomalous to say that conduct by the trustee which is deceptive to the beneficiary does not give rise to a 10b–5 cause of action.

The instant complaint, however, cannot survive on this basis, because it alleges no conduct that may fairly be viewed as materially deceptive to the Sandler Trust beneficiaries. The plaintiff's claims do not involve misrepresentation, and the nondisclosure he alleges was of (1) facts concerning the value of Kayser-Roth stock, and (2) facts concerning Kayser-Roth's control over the Trust investments, as well as (3) numerous adverse inferences from, and pejorative characterizations about, those facts.

■ As a general rule, so long as material facts are disclosed or already known, it is not deceptive to fail to "characterize" those facts with "pejorative nouns and adjectives," or to fail to verbalize all adverse inferences expressly. *Goldberg v. Meridor,* 567 F.2d 209, 218 n. 8 (2d Cir. 1977),

---

**17.** In *Kirshner v. United States,* 603 F.2d 234 (2d Cir. 1978), Judge Smith, writing for himself and Judge Mansfield, noted the similarity between a stockholder's derivative action and a suit similar to this one. He stated:

We think the beneficiary of a pension trust, like the shareholder in a derivative suit, has standing to attack securities frauds perpetrated or threatened by the trustees of his fund. . . .

Kirshner has standing, as beneficiary of the fund, to bring this action on behalf of the fund against those alleged to have defrauded the fund in its purchase of securities, and the complaint may be interpreted to charge participation by these defendants in fraudulent sale of securities by and to the fund.

At 240–241. Judge Moore dissented. At 241–243.

**18.** *See, e. g., Schoenbaum v. Firstbrook,* 405 F.2d 200, 211 (2d Cir.), *rev'd,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

**19.** *Schoenbaum v. Firstbrook, supra,* 405 F.2d at 215 (Hays, J., dissenting), *quoted in Goldberg v. Meridor, supra,* 467 F.2d at 214; *Popkin v. Bishop,* 464 F.2d 714, 719 (2d Cir. 1972); *Maldonado v. Flynn,* 448 F.Supp. 1032, 1037 (S.D.N.Y.1978), *aff'd in part, rev'd in part on other grounds,* 597 F.2d 789 (2d Cir. 1979).

**20.** This notion, which has been labelled "constructive deception" by some, is discussed *infra.*

**21.** According to the *Restatement (Second) of Trusts* § 199 (1959):

The beneficiary of a trust can maintain a suit
 (a) to compel the trustee to perform his duties as trustee;
 (b) to enjoin the trustee from committing a breach of trust;

Furthermore, "[i]t is immaterial that there is an adequate remedy at law." *Id.,* comment a.

*cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), *on remand,* 81 F.R.D. 105 (S.D.N.Y.1979); *accord, Golub v. PPD Corp.,* 576 F.2d 759, 765 (8th Cir. 1978); *Hundahl v. United Benefit Life Insurance Co.,* 465 F.Supp. 1349, 1364–66 (N.D.Tex.1979); *Rodman v. Grant Foundation,* 460 F.Supp. 1028, 1037–41 (S.D.N.Y. 1978), *appeal argued,* No. 744 (2d Cir. May 9, 1979); *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228, 1253–54 (D.Del.1978); *Goldberger v. Baker,* 442 F.Supp. 659, 664–65 (S.D.N.Y.1977); *see Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1084 (2d Cir. 1977). The principle underlying these cases appears to be that, once the facts are disclosed, a failure to articulate adverse inferences from or pejorative descriptions of those facts is not materially deceptive: a reasonable person would not be deceived by their nondisclosure, since he would be able to draw whatever inferences and append whatever characterizations he believed appropriate. Of course, the distinction between facts and characterizations may not be a nice one. *See, e. g., Hundahl v. United Benefit Life Insurance Co., supra.*

Furthermore, "there is no duty to disclose information to one who reasonably should already be aware of it." *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978) (quoting *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) ); *accord, Rodman v. Grant Foundation, supra,* 460 F.Supp. at 1035–36 (citing several cases). It is therefore not deceptive to fail to disclose information that was "easily enough available by duly diligent inquiry." *Rodman v. Grant Foundation, supra.*

*Value of Kayser-Roth stock.* Paragraph 27 of the complaint alleges that the defendants failed to disclose:

> that the common stock of Kayser-Roth was not of investment quality suitable for Trust funds; that the financial condition of Kayser-Roth was in large measure dependent upon the developments of the clothing industry in general, which was traditionally subject to radical fluctuations as a result of fickle changes of public taste in the field of fashion; that the financial growth of Kayser-Roth was in large part contingent upon a continual program of acquisitions to generate earnings and that there could be no certainty that such acquisition program could be maintained or maintained successfully; that many of the acquisitions by Kayser-Roth were in fields in which Kayser-Roth had never before participated and had no experience; that many of Kayser-Roth's acquisitions were consummated in the fever of the conglomerate fad of the late 1960's at prices which were unrealistic . based upon sound valuations; that shortly after their acquisition, Kayser-Roth management was considering divesting itself of the ownership of certain of these problem acquisitions; that the profits from the hosiery division, which was traditionally the largest contributor to the profits of Kayser-Roth, were under heavy pressure as a result of longer skirt lengths and the trend toward pant suits and slacks; that many of the Kayser-Roth divisions were under heavy pressure from increasing foreign competition; that Kayser-Roth was involved in foreign currency exchange and subject to radical fluctuations in that market; that Kayser-Roth was experiencing disproportionate higher costs of its raw material and labor; that there had been a sharp decline in earnings from Kayser-Roth's specialty textile division; that at the time of the purchase of its stock by the Trust, the price/earnings ratio of Kayser-Roth's stock was at an all time high, which could not be justified on the basis of comparable price earnings ratios . . . .

Complaint ¶ 27, at 9–11.

With the possible exception of Kayser-Roth's intentions concerning its so-called "problem" acquisitions, all of the factual information contained in this paragraph was readily available to plaintiff, especially since, as the complaint itself concedes, Kayser-Roth stock was at all material times traded on the New York Stock Exchange, and therefore subject to SEC and the Exchange's reporting requirements. And fail-

ure to disclose that Kayser-Roth was "considering" divesting certain of its holdings, could not, by itself, have been materially deceptive to the beneficiaries. The remainder of the paragraph comprises pejorative characterizations and adverse inferences, which, it. appears, the plaintiff has drawn without the defendants' help.

*Kayser-Roth's control.* Paragraph 28 of the complaint alleges that the defendants failed to disclose:

a. That they had purchased Kayser-Roth stock with Trust assets;

b. That the Trust's investment in Kayser-Roth stock constituted more than 70% of Trust assets;

c. That the trustees of the Trust had been replaced shortly after the acquisition of A. Sandler Co. by Kayser-Roth;

d. That the new trustees could not have undivided loyalty to the Beneficiaries of the Trust by reason of the loyalty owed by them to Kayser-Roth and its shareholders and their own conflicting self-interests;

e. That the Trust had been improperly, retroactively amended by Kayser-Roth in 1971 so as to justify its discontinuance of contributions as of October of 1968;

f. That such purported amendment should have, by the terms of the Trust, effected an automatic termination of the Trust;

g. That the individual defendants as controlling shareholders and/or directors and/or officers of Kayser-Roth had and would continue to acquire detailed information concerning Kayser-Roth's affairs, much of which was in the nature of "inside" information not generally available to the investing public; that possessed of

such information they were or might be inhibited from selling the Kayser-Roth stock on behalf of the Trust because of possible violations of the Securities Acts; and that this inhibition was or might be in conflict with the individual defendants' fiduciary obligations to plaintiff and other Beneficiaries of the Trust with respect to the Trust's investment in Kayser-Roth stock.

Complaint ¶ 28, at 12.

The only facts contained in this paragraph that might arguably have been materially deceptive are that Kayser-Roth replaced the Committee members with its own insiders, and that these persons invested more than 70% of the Trust assets in Kayser-Roth stock. The attendant conflicts of interest are readily inferable. As to subparagraphs "e" and "f," they are merely inferences about the legal effects of the 1971 amendment, about which the beneficiaries knew or could readily have learned.

Failure to disclose the replacement of Committee members and the investment in Kayser-Roth stock, however, could not have been materially deceptive to the beneficiaries. The beneficiaries knew, or could readily have learned by reading the Agreement, that upon acquiring Sandler, Kayser-Roth gained the virtually unrestricted power to appoint and remove Committee members,[22] and that investment in Kayser-Roth stock was expressly permitted, and implicitly anticipated, by the terms of the Agreement.[23] Moreover, nothing in the Agreement required the announcement of Trust investments or changes in the Committee's membership; nor does the complaint even allude to any other reasons—for example, previous practice—for the beneficiaries to have ex-

---

**22.** According to the pertinent provisions of the Agreement:

The Committee shall be appointed by the Board of Directors to serve for a term of three (3) years, or for such lessor [sic] period as may be specified by the Directors, and until their successors in office have been duly appointed and qualified or until their death or their resignation or removal as hereinafter provided. There shall be no limitation on the number of terms which may be served by one person.

Complaint, Exhibit A, § 8.02.

Any Committeeman may be removed from such office by vote of the Board of Directors, *for any cause or without specified cause,* and without hearing, provided that the Board of Directors shall give written notice of such removal to the Committeeman, his co-Committeeman and the Trustee.

*Id.* § 8.05.

**23.** *See* note 3 *supra.*

pected such announcements. Finally, neither the one-sentence annual statements nor the May 29, 1970 letter contain any misleading partial disclosures with respect to investment of Trust assets or the composition of the Committee, especially in light of what the beneficiaries knew or should have known about the pertinent provisions of the Agreement.[24] Therefore, in the absence of some particular reason for the beneficiaries to draw a specific inference from the defendants' silence on these matters, such silence cannot "fairly be viewed as deceptive" to them.

*"Deception" of the Trust ·*

In *Goldberg v. Meridor, supra,* Judge Friendly, writing for himself and Judge Timbers, held that a corporation may be said to be deceived, even though all of its directors are fully informed as to all material facts:

> [T]here is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is nondisclosure or misleading disclosures as to the material facts of the transaction.

567 F.2d at 217 (relying on *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct.

1747, 23 L.Ed.2d 219 (1969)).[25] Even Judge Meskill, who dissented in *Goldberg,* agreed with the majority opinion on this point. *See* 567 F.2d at 221–22.

This concept, which some commentators and at least one court have labelled "constructive" deception,[26] has evolved largely from the notion that a corporation is, in law if not in reality, a "person," an "entity" with numerous legal rights and liabilities ordinarily possessed by real persons.[27] Since a corporation may sue and be sued in its own name, in some cases its "mental state" may be material: in a Rule 10b–5 action by a corporation, the question arises, "Was the corporation deceived?" But as one commentator has quipped, "a corporation's being 'deceived'" is as difficult to imagine "as a corporation's being in love."[28]

The inquiry then must turn to the corporation's agents.

In general, if the corporation's agents have not been deceived, neither has the corporation. However, as in other situations governed by agency principles, knowledge of the corporation's officers and agents is not imputed to it when there is a conflict between the interests of the officers and agents and the interests of the corporate principal. Therefore, a corporation may be defrauded in a stock transaction even when all of its directors know all of the material facts, if the conflict between the interests of one

---

24. Since the complaint fails to state when the Trust completed its acquisition of Kayser-Roth stock, the May 29, 1970 letter may be immaterial. *See Santa Fe,* 430 U.S. at 474 n.14, 97 S.Ct. 1292.

25. *Accord, Maldonado v. Flynn, supra,* at 795; *Kaplan v. Bennett,* 465 F.Supp. 555, 563–66 (S.D.N.Y.1979); *cf. Wright v. Heizer Corp.,* 560 F.2d 236, 246–49 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978) (expressed in terms of duty to disclose). *But cf. IIT v. Cornfeld,* 462 F.Supp. 209, 223–26 (S.D.N.Y.1978) (finding no justifiable basis for extending jurisdiction over a foreign investment trust on a theory of constructive deception); *Tyco Laboratories, Inc. v. Kimball,* 444 F.Supp. 292, 297–99·(E.D.Pa.1977) (refusing to extend constructive deception theory absent allegation that directors who caused the corporation's securities transaction had any pecuniary interest in it).

26. *See Kaplan v. Bennett,* 465 F.Supp. 555, 562–66 (S.D.N.Y.1979); Project, *supra,* 26 Buffalo L.Rev. at 567–79; Note, *supra,* 91 Harv.L. Rev. at 1881–84. Perhaps a more useful name would be "virtual" deception.

27. *See* H. Henn, *Handbook of the Law of Corporations* §§ 78–80 (1970). Some circuit court decisions prior to *Santa Fe,* however, seemed to rest the notion on the general remedial purposes of section 10(b) and Rule 10b–5. *See, e. g., Shell v. Hensley,* 430 F.2d 819, 826–27 (5th Cir. 1970); *Ruckle v. Roto American Corp.,* 339 F.2d 24, 29 (2d Cir. 1964).

28. Patrick, *Rule 10b–5 Equitable Fraud and Schoenbaum v. Firstbrook,* 21 Ala.L.Rev. 457, 469 (1969).

or more of the directors and the interests of the corporation prevents effective transmission of material information to the corporation, in violation of Rule 10b–5(2).

*Schoenbaum v. Firstbrook*, 405 F.2d 200, 211 (2d Cir.) (citations omitted), *rev'd*, 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 211 (1969).[29]

The theory of constructive deception, therefore, is based upon the established rule of agency law that:

> A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes.

*Restatement (Second) of Agency* § 282(1) (1958). According to Professor Mechem's treatise, this rule "rests properly on the ground that, under the circumstances, there was really no agency . . . . It should be confined, therefore, to the cases which really fall within the reason: and notice should be imputed wherever there is agency or ratification." 2 *Mechem on Agency* § 1822 (2d ed. 1914). Whether constructive deception applies to trust relationships is thus a conceptually intriguing question. It need not be decided now, however, for even if it could apply to a trust, the Court would not find it applicable here.

■ Not every conflict negates an agency. An agent's duties depend upon his agreement with the principal, and the principal may consent to or ratify an agent's conflict of interest.[30] Such conflicts should not serve to preclude imputation of knowledge from the agent to the principal, and hence should not give rise to constructive deception.[31]

■ Similarly, the duties of a trustee depend upon the terms of the declaration of trust, and the settlor may retain control over the trustee, or create conflicting loyalties.[32] Consequently, as with an agency, such control and conflicts should not *per se* occasion a finding of constructive deception.

In the instant case, the Agreement created only one duty running from the Committee members to the beneficiaries: to hold and invest Trust assets for the beneficiaries' "exclusive" benefit. But even this duty is limited by the Agreement's express permission to invest the Trust assets in the employer's capital stock, and by the employer's retention of control over the selection and removal of Committee members. Nevertheless, the plaintiff seeks to predicate a theory of constructive deception upon the following:

a. As controlling shareholders and/or officers of Kayser-Roth, the individual defendants owed an undivided loyalty to Kayser-Roth and its shareholders which included the obligation to do such things as would inure to the benefit of Kayser-Roth and the Kayser-Roth stockholders, and not to disclose any inside or confidential information which would adversely affect Kayser-Roth or its stock or which would constitute a violation of the insider disclosure requirements of the Securities Acts.

b. As individuals, the defendants had a self-interest in perpetuating their own control of Kayser-Roth with a minimum commitment of their own funds, as well as an interest in seeing to it that they received the maximum possible compensation as officers of Kayser-Roth, and in seeing to it that the "float" of the Kayser-Roth stock was in safe hands which

---

**29.** This is essentially the reasoning that was adopted in *Goldberg v. Meridor, supra*, 567 F.2d at 215–18.

**30.** *See Restatement (Second) of Agency* §§ 236, 376 (1958).

**31.** *See 2 Mechem on Agency* § 1824 (2d ed. 1914); *cf. Maldonado v. Flynn, supra*, at 793–795 (desire to "curry favor" with interested directors not sufficient conflict to preclude im-

putation of knowledge); *Tyco Laboratories, Inc. v. Kimball*, 444 F.Supp. 292 (E.D.Pa.1977) (directors' desire to retain control, but no personal pecuniary interest, not sufficient); *Falkenberg v. Baldwin*, [1977–78] Fed.Sec.L.Rep. (CCH) ⸿ 96,086 (S.D.N.Y.1977) (same).

**32.** *See Restatement (Second) of Trusts* § 164 (1959).

would not be tempted to sell the stock and depress the market price at a time which would not be advantageous to the individual defendants.

c. As trustees and/or members of the Committee of the Trust, the individual defendants were required to have an undivided loyalty to the Beneficiaries of the Trust and to invest the assets of the Trust in a prudent and diversified manner to protect the retirement funds of the Beneficiaries and to dispose of such assets which were no longer prudent to hold and which were not in the best interest of the Trust Beneficiaries.

Complaint ¶ 25, at 8–9.

What the plaintiff has done, however, is to mischaracterize the individual defendants' duties of loyalty. Because of their dual positions,[33] the Committee members owed neither Kayser-Roth nor the Trust their "undivided" loyalty. Their loyalties were divided from the outset, and such divided loyalties were built into the trust relationship by the terms of the Agreement. Therefore, neither their "conflicts of interest," nor their own desires to maintain control, see *Falkenberg v. Baldwin, supra,* give rise to a finding of constructive deception.

*Section 17(a)*

■ The absence of deceptive conduct does not dispose of all the securities law claims, because section 17(a) of the 1933 Act is in many respects broader than section 10(b) of the 1934 Act.[34] In one respect, however, it is narrower. Whereas section 10(b) applies to conduct "in connection with the purchase or sale of any security," sec-

tion 17(a) applies only to conduct "in the offer or sale." Although this latter phrase is "expansive enough to encompass the entire selling process, including the seller/agent transaction," *United States v. Naftalin,* —— U.S. ——, ——, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979), it cannot reasonably be held to encompass transactions between a trust beneficiary and a trustee who *purchased* securities, unless it be held that there is no distinction at all between the two phrases. Neither the sellers of Kayser-Roth stock nor their agents are parties to this lawsuit. The Court concludes, therefore, that the complaint alleges no conduct by the defendants "in the offer or sale of securities."

## STATE LAW CLAIMS

*Claim VI*

■ Claim VI of the complaint is based upon section 10.01 of the Agreement:

Although this is intended to be a permanent Plan and Trust for the exclusive benefit of the Members thereof, established with the bona fide intention and expectation that the Company will be able to make its contributions indefinitely, the Company is not and shall not be under any obligation or liability whatever to continue its contributions or to maintain the Plan and Trust for any given length of time, but may, at any time in its sole and absolute discretion, discontinue such contributions and terminate this Plan and Trust.

**33.** *See* note 3 *supra.* The Court notes also that the Agreement, executed in 1953, named as one of the initial Committee members Joseph Bloom, who in or before 1962 became Sandler's president.

**34.** Section 17(a) of the Securities Act of 1933 provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

In *Kirschner v. United States, supra,* a divided panel of the Second Circuit found an implied private right of action under section 17(a).

The plaintiff contends that by discontinuing company contributions as of November 1, 1968, without concomitantly terminating the Trust, the defendants breached this provision. The defendants respond that section 10.01, as drafted, permitted the discontinuance of contributions without termination. Even if it did not, they argue, it was superseded by the amendment of February 13, 1970, authorizing such action. The plaintiffs counter that the amendment, too, was impermissible.

The Court finds material questions of fact going to the merits of Claim VI, and, accordingly, denies the motion for summary judgment. As stated in a prior memorandum in this case, section 10.01 is "ambiguous as to whether the board was obligated to terminate the Trust when it effected the discontinuance of company contributions." Memorandum Decision at 4-5, No. 75 Civ. 1507 (S.D.N.Y. Oct. 20, 1977). Moreover, Article 3 of the Agreement provided that Sandler could amend the Plan and Trust without the consent of the beneficiaries "to effectuate the purposes" of the Plan and Trust, so long as the amendment did not divest a beneficiary of his or her interest, or allow the Trust assets to be "used for or diverted to purposes other than for the ex-clusive benefit of" the beneficiaries.[35] Thus, whether the amendment was a valid one under the Agreement also raises questions of fact which may not be resolved on a motion for summary judgment.

■ As a further defense to Claim VI, the defendants raise the statute of limitations, asserting it to be three years under N.Y.C.P.L.R. § 214 (McKinney 1978). The Court finds, however, that Claim VI is in essence an action on a contract;[36] consequently, the appropriate period of limitations is six years. N.Y.C.P.L.R. § 213(1), (2) (McKinney 1978).[37] Since the defendant admits that the plaintiff commenced his action on Claim VI within five years of its accrual, it is not time barred.

## The Defendant Zimring

In a previous decision, this Court denied a motion virtually identical to the one now advanced on behalf of the defendant Robert Zimring, stating:

> Robert Zimring, the other moving defendant, was Secretary to the trustees and members of the Committee. He claims that summary judgment should be granted in his favor because, as Secre-

---

**35.** The Agreement states in pertinent part:

Section 3.01. This Plan and Trust having been created with the bona fide intent and expectation that it will qualify for exemption under Section 165(a) of the Internal Revenue Code and that the Company's contributions thereunder shall be deductible under Section 23(p) of said Code, the Company therefore reserves to itself the right, acting by its Board of Directors, to amend this Plan and Trust, at any time and from time to time, and without the consent of any Member or Beneficiary, in any manner necessary or advisable in order (a) to qualify or continue the qualification of said Plan and Trust under said Section 165(a) and to meet the requirements of said Section 23(p) as they are now in force or as they may hereafter be changed or amended; (b) to meet or comply with present or future requirements of any other Federal or State laws applicable to or affecting said Plan and Trust; (c) to effectuate the purposes of this Plan and Trust.

Section 3.02. No such amendment, however, shall (a) vest the Company with any right, title or interest in or to the assets of the Trust; or (b) divest a Member of any interest previously credited to him; or (c) allow any part of the assets of the Trust to be used for or diverted to purposes other than for the exclusive benefit of participating employees; or (d) discriminate in favor of officers, shareholders, supervisors or highly compensated employees; or (e) increase the duties and obligations of the Trustees hereunder except with their consent.

The statutory references are to the Internal Revenue Code of 1939.

**36.** See Hadden v. Consolidated Edison Co., 34 N.Y.2d 88, 96–97, 356 N.Y.S.2d 249, 255, 312 N.E.2d 445 (1974); see generally Annotation, 42 A.L.R.2d 461, 467–71 (1955).

**37.** The parties have not raised any choice of law questions, and appear to proceed on a theory that New York law applies. Without ruling on this point, the Court notes that under Massachusetts law, the limitations period would be six years, see Mass.Ann.Laws ch. 260, § 2 (Michie/Law. Co-op 1968 & Supp. 1978); consequently, under New York's "borrowing statute," N.Y.C.P.L.R. § 203 (McKinney 1978), the result would be the same.

tary, he had only clerical and administrative duties and was completely subject to the instructions of the Committee members and trustees. The Court disagrees. Plaintiff should not be bound by Zimring's affidavit but should be afforded the opportunity to take discovery on the scope of Zimring's authority and his connection with the alleged wrongdoing.

Memorandum Decision at 5, No. 75 Civ. 1507 (S.D.N.Y. October 20, 1977). All that has changed since then is that the plaintiff has taken Zimring's deposition, and, as might have been expected, Zimring testified that his duties were purely ministerial. Accordingly, this motion must again be denied. The defendant's implied suggestion that the material facts are now undisputed defies common sense.

## CLASS CERTIFICATION

### Prerequisites

 Rule 23(a) of the Federal Rules of Civil Procedure lists four prerequisites for class action certification:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

As to the first prerequisite, the defendant agrees that there are at least seventy beneficiaries of the Plan who would be members of the class. This is sufficient, especially in light of the substantial identity of claims. See Marcera v. Chinlund, 595 F.2d 1231 at 1238 (2d Cir. 1979).

There is little dispute that the second and third prerequisites are also met. Whether the defendants actually committed the acts alleged in the complaint are questions of fact common to all beneficiaries of the Plan. Moreover, all of the remaining legal claims based upon these alleged facts are common to all beneficiaries. Proof of conduct constituting a breach of fiduciary duty or a breach of the Trust Agreement is likely to be the same for all beneficiaries' claims. In short, Klamberg's claims arise solely from acts of the defendants directed towards all of the beneficiaries, and are not merely typical of the claims of other beneficiaries, but are the same.

As to the fourth prerequisite, the defendants raise three points, none of which attack the competence of plaintiff's counsel. First, they charge that in 1974 Klamberg offered to settle his claim. The Court finds that this offer, made before this action was brought, was rejected, and that since the commencement of this action, has not been resurrected. It does not, therefore, constitute a conflict that would disable the plaintiff from acting as representative. As Judge Gagliardi stated in De Milia v. Cybernetics International Corp., 15 F.R. Serv.2d 1385 (S.D.N.Y.1972): "That [the representative plaintiff] attempted to settle his individual claim before commencing a protracted lawsuit is not unusual. More importantly, now that an action has been commenced in class form it cannot be settled without court approval . . . ." Id. at 1389 (citing Fed.R.Civ.P. 23(e)).

Second, the defendants argue that one of the plaintiff's demands—distribution of the Trust assets to the beneficiaries—may not be in the best interests of all beneficiaries. What the complaint basically seeks, however, is an approximately $500,000 increment to the Trust assets, in which each beneficiary has an interest. It is difficult to see how such a recovery would affect any beneficiary adversely. Moreover, the remote possibility that relief may have to be tailored to meet the differing needs of individual beneficiaries does not preclude class certification. See, e. g., Marcera, supra, at 1239.

Third, and finally as to the adequacy of representation, the defendants argue that

the plaintiff is subject to a defense not common to other members of the class, namely, that the plaintiff had access to the Plan's books and records, and could have ascertained the status of the Plan's investments sooner than he did. Even if this were a legally sufficient defense to the remaining claims, it would not, by itself, establish plaintiff's inadequacy. *See, e. g., Huff v. N. D. Cass Co.*, 485 F.2d 710 (5th Cir. 1973); *Mersay v. First Republic Corp.*, 43 F.R.D. 465, 469 (S.D.N.Y.1968). It does not appear at present that this particular defense "will so focus the representative and his counsel on unique and untypical aspects of the common claim that the representation of absentee class interests will be inadequate in fact." 3B *Moore's Federal Practice* ¶ 23.07[1], at 23–214 (2d ed. 1978). And should the issue become especially significant, the Court can try it separately. Fed.R.Civ.P. 23(c)(4), (d)(1); *see, e. g., Berland v. Mack*, 48 F.R.D. 121, 128 (S.D.N.Y. 1969).

*Type of Class Action*

█ Besides the four prerequisites of subsection 23(a), at least one of the subdivisions of subsection 23(b) must be satisfied before an action may be maintained as a class action. *See, e. g., Marcera, supra,* at 1237. The Court finds that the instant action satisfies the requirements of subdivision 3.[38] Virtually every legal and factual issue is common to all class members, with the possible exceptions of each beneficiary's actual knowledge or lack of due diligence, and each beneficiary's actual damages. While it is true that the members of the instant class have claims substantial enough to warrant bringing individual actions, this factor does not outweigh the advantages of having the defendants' liability determined in one proceeding, especially since each member will have the opportunity to opt out. Fed.R.Civ.P. 23(c)(2). Finally, there is no evidence of any similar litigation already commenced, of any undesirability of having all claims consolidated in this forum, or of any peculiar problems likely to arise in the management of this litigation.

## CONCLUSION

In accordance with the foregoing, plaintiff's federal securities law claims are dismissed for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6), 56.

All other motions by the defendants are denied.

Pursuant to Fed.R.Civ.P. 23(c), the Court finds that this action may be maintained as a class action. Plaintiff is directed to submit a proposed order, on notice to all parties, describing the class and providing for notice to all class members pursuant to Fed.R.Civ.P. 23(c)(2).

SO ORDERED.

---

**38.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.