Harry LEWIS, et al., Plaintiffs,

v.

POTLATCH CORPORATION, et al., Defendants.

No. 85 Civ. 9525 (JES).

United States District Court, S.D. New York.

July 17, 1989.

Wolf Popper Ross Wolf & Jones, New York City, for plaintiffs; Marian Probst Rosner and Klari Neuwelt, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants Potlatch Corp.; Alexander R. Sussman and John Sullivan, of counsel.

Davis Polk & Wardwell, New York City, for defendants First City Financial Corp., Ltd. and First City Trust Co.; William L. Rosoff, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

In this action, plaintiffs Harry Lewis, Barnett Stepak, David Jaroslawicz, and Eugene Mendeloff, owners of common stock of defendant Potlatch Corporation, bring this action seeking damages and other relief under section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a), and the common law. The Consolidated Amended Derivative and Class Action Complaint ("Complaint") is based upon two transactions: (1) shareholder approval of a voting rights amendment and (2) the repurchase of stock by Potlatch from First City Financial Corporation, Ltd. ("First City"). Defendants move to dismiss the Complaint on the ground that it does not state a claim for relief. For the reasons that follow, the securities law claim is dismissed and the state law claims are dismissed without prejudice.

## BACKGROUND

Accepting the allegations of the Complaint as true, as the Court must on a motion to dismiss, the facts alleged are as follows. Potlatch is in the forest products industry, an industry which experienced a wave of takeovers in the 1980's. *See* Complaint at ¶¶ 5, 27. In 1985, the Potlatch Board of Directors approved a voting rights amendment which would grant four votes per share to current shareholders, to future acquirors who would hold the stock for forty eight months, and to certain specified holders of stock. *See* Complaint at ¶ 32. On October 22, 1985, the Board issued a proxy statement ("October Proxy") as part of their solicitation of proxies in support of the voting rights amendment. *See id.* at ¶ 35.

Subsequently, Samuel, William and Hyman Belzberg ("the Belzbergs"), who own and control First City, proposed to acquire all of Potlatch's outstanding shares at $45 per share and offered to negotiate a higher price contingent upon rescission of the amendment. *See id.* at ¶¶ 16, 38. The Belzbergs then commenced litigation on behalf of Potlatch ("the First City suit"), alleging the Board's breach of fiduciary duty. *See id.* at ¶ 41. The Potlatch Board rejected the Belzberg offer and authorized a repurchase plan calling for the repurchase of 20% of Potlatch shares in the open market or in privately negotiated transactions. *See id.* at ¶ 44.

The Belzbergs' shares were purchased for $43 per share, and Potlatch paid them $990,000 for expenses, including legal fees for the First City suit. *See id.* at ¶ 45. The Belzbergs agreed not to acquire additional shares of Potlatch for five years and agreed to discontinue the First City suit. *See id.* Plaintiffs allege that this was a "greenmail" transaction designed to buy off the Belzbergs. *See id.* at ¶ 46. In addition, they allege that purchases were not in fact made on the open market and that the repurchase plan was discontinued the day after stockholder approval of the voting rights amendment was obtained. *See id.*

The Board issued a supplement to the proxy statement on November 22 ("Supplement"), which addressed events since the original proxy, including the repurchase program and buyback of stock from the Belzbergs. *See id.* at ¶ 49. The voting rights amendment was approved by the Potlatch shareholders on December 12, 1985. *See id.* at 50.

## DISCUSSION

### I. *Proxy Claims*

Plaintiffs allege that the October Proxy and the Supplement issued in relation to the voting rights amendment were materially false and misleading in several respects. Since the proxy materials are integral to plaintiffs' claims and are before the Court on this motion, the Court may properly consider them. *See Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988); *Furman v. Cirrito*, 828 F.2d 898, 900 (2d Cir.1987). The Court addresses each of plaintiffs' allegations of falsity in turn.

### A. *Entrenchment Motive*

■ Letters issued along with the October Proxy and the Supplement stated that the intent of the voting rights amendment was to give longterm shareholders a greater voice in the affairs of the company. *See* Letters from Richard B. Madden dated October 22, 1985 and November 22, 1985. Plaintiffs allege that this statement was false because management's real purpose was entrenchment. *See* Complaint at ¶¶ 37(i), 49(i).

■ However, where all of the relevant facts which a reasonable shareholder would need to make a decision on a proposed corporate action are disclosed, the proxy materials need not disclose management motive. *See Rodman v. Grant Foundation*, 608 F.2d 64, 71 (2d Cir.1979). In this case, the proxy statement fully described the proposed voting rights amendment and the effect it would have on stockholders. Indeed, it specifically disclosed that directors and officers of the company could have an increasingly higher percentage of the voting power of the company if the

amendment were adopted. *See* October Proxy at 3. Moreover, it stated that "the Amendment could increase the likelihood that incumbent Directors and officers will retain their positions." *See id.* at 6. Any shareholder voting for the proposal, therefore, was informed that passage of the amendment could concentrate control in the hands of present management and that entrenchment of the present board could result.

In addition, the Supplement set forth in detail the allegations of the First City complaint and stated that that complaint alleged "that the proposed Amendment ... was part of an unlawful effort by the individual defendants and management to retain and entrench their control of the Company." *See* Supplement at 3. Indeed, the First City complaint, containing entrenchment allegations similar to those in this Complaint, was attached to the Supplement. *See id.* at S1–S8. *Cf. Abramson v. Nytronics Inc.*, 312 F.Supp. 519, 524–26 (S.D.N.Y.1970). In view of these circumstances, a claim of falsity predicated upon a failure to disclose management's entrenchment motive cannot be legally sufficient.

### B. *Board Opposition to Takeovers*

█ Plaintiffs further allege that the October Proxy falsely stated that the amendment was designed to encourage persons seeking to take control to enter into arms length negotiations; that management was not aware of any existing or threatened attempts to take control; and that the board was not committed to opposing all takeover attempts. *See* Complaint at ¶ 37(iii)-(v). Plaintiffs allege that these statements were not true because management was opposed to all takeover attempts and the amendment was designed to thwart known or threatened takeover attempts. *See id.*

As stated above, an entrenchment motive need not be disclosed if all relevant facts are disclosed. In any event, the October Proxy and the Supplement made clear the anti-takeover effect of the proposed amendment. After stating that the company could be a potential takeover target, the October Proxy stated that passage of the amendment "could result in stockholders not having an opportunity to sell their shares at a premium to a third party seeking to acquire the Company on terms opposed by the holders of the long-term shares." *See* October Proxy at 4, 6. Moreover, the Supplement went on to state that descendants of early founding families and long time shareholders of predecessor companies could own 51% of the outstanding shares after the repurchase. *See* Supplement at 4. In addition, a similar allegation that the Board falsely stated that it was not opposed to all takeover attempts was set forth in the *First City* complaint, which was attached to the Supplement. *See id.* at S4; *cf. Avnet, Inc. v. Scope Indus.*, 499 F.Supp. 1121, 1125–26 (S.D.N.Y.1980); *Abramson, supra,* 312 F.Supp. at 524–26. Furthermore, the First City effort to take control was also fully described. *See* Supplement at 1–3. The proxy materials therefore clearly disclosed to shareholders that the effect of the amendment would be to discourage takeovers, that it could prevent them from being able to tender their shares in a takeover attempt, and that a specific attempt at control by First City had taken place.

### C. *"Greenmail" Payment*

█ Plaintiffs also allege that while the October Proxy stated that management was opposed to greenmail and that the amendment would discourage greenmail, the Supplement falsely stated that the greenmail payment to the Belzbergs was made pursuant to a repurchase plan. *See* Complaint at ¶¶ 37(ii), 49(ii). However, although the October Proxy stated that " 'greenmail' repurchases divert valuable resources of a company" and that the voting rights amendment "will discourage 'greenmail,' " *see* October Proxy at 4, the Supplement fully disclosed the facts surrounding the repurchase of stock from the Belzbergs and the facts leading up to the

repurchase,[1] *see* Supplement at 1–4. While it is true that the Supplement did not characterize the payment as "greenmail," there is no requirement that a proxy characterize disclosed information, as long as there is disclosure of all pertinent facts. *See Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 697 (2d Cir.1973); *Klamberg v. Roth,* 473 F.Supp. 544, 551 (S.D.N.Y.1979).

■ Moreover, the Supplement further stated that the purpose of the plan was "to frustrate the efforts of First City to acquire control of the Company at an inadequate price and to facilitate the sale of shares by those stockholders who wish to sell at this time." *See* Supplement at 3. Plaintiffs allege that this statement and the statement that the Company intended to continue the plan "in an orderly and careful fashion" were both false, and that purchases were not in fact made on the open market. *See* Complaint at ¶ 49(iv)–(v); *see also* Supplement at 4. The Supplement continued, however, that "[t]he number of additional shares purchased, *if any,* will depend on a variety of factors ..." and that purchases would be made "in the open market *or* in privately negotiated transactions." *See* Supplement at 3–4 (emphasis added). The Supplement disclosed, therefore, that a purchase of additional shares might not be made in the future and might not be made on the open market.[2]

■ In addition, assuming that the statements regarding the repurchase plan were false, a false statement that the repurchase plan was going to be continued could only be material if "there is a substantial likelihood that a reasonable shareholder would [have] consider[ed] it important in deciding" whether to vote in favor of the *voting rights amendment. See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Wilson v. Great American Indus., Inc.,* 855 F.2d 987, 991 (2d Cir.1988). Here, a belief in the mind of a reasonable shareholder that he would have the opportunity to sell his shares pursuant to a repurchase plan could not have influenced his decision on the issue of whether to vote for the voting rights amendment. *See Lewis v. Valley,* 476 F.Supp. 62, 66 (S.D.N.Y.1979). Indeed, whether the repurchase plan was to be continued had nothing whatsoever to do with the merits of the voting rights amendment, especially since, as noted above, shareholders were informed of the anti-takeover effect of the amendment, that it might concentrate control in the hands of the long term shareholders and officers and directors, and that the repurchase plan might have already placed 51% of the outstanding stock in the hands of a "family group."

### D. *NYSE Delisting*

■ The October Proxy disclosed that under current New York Stock Exchange ("NYSE") rules, adoption of the voting rights amendment could lead to the delisting of Potlatch stock on the exchange, that the NYSE rules were being reviewed, and that "stockholders should assume that if [the] Amendment is adopted the Common Stock may not be permitted to continue to be listed on the NYSE." *See* October Proxy at 6–7. Plaintiffs allege that the proxy statement failed to disclose that the possible delisting of Potlatch stock on the

---

**1.** *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066 (S.D.N.Y.1987), relied upon by plaintiffs, is inapposite. In that case, the alleged greenmail repurchase occurred before the issuance of any proxy statement, and the original proxy statement failed to mention the repurchase. *See id.* at 1070–71. Although a supplemental proxy statement discussed details of the repurchase of stock in that case, it did not mention the individual involved or his plan to possibly take over the company. *See id.* at 1076. Here, the repurchase occurred after the October Proxy, and the Supplement set forth the events surrounding the Belzbergs' offer and the repurchase of shares. *See* Supplement at 1–4.

**2.** Plaintiffs also allege that the Supplement failed to state that the Belzbergs had been paid a premium for their shares and that they had been reimbursed for their expenses and legal fees in bringing the First City suit. *See* Complaint at ¶ 49(iii). The Supplement's disclosures that First City was paid $43 for its shares and $990,000 for expenses, however, were clearly sufficient to inform a reasonably prudent stockholder of these facts.

NYSE was a disadvantage. *See* Complaint at ¶ 37(vi).

The disclosure here was clearly adequate. A proxy statement need not state what would be apparent to a reasonable shareholder. *See Rodman, supra,* 608 F.2d at 71; *Management Assistance Inc. v. Edelman,* 584 F.Supp. 1021, 1027 (S.D.N.Y.1984). Moreover, a proxy statement need not characterize the obvious effect of disclosed information, which is what plaintiffs seek here, *i.e.,* a statement that delisting was a disadvantage. *See Klamberg, supra,* 473 F.Supp. at 551.

## II. *State Law Claims*

Plaintiffs have also alleged several claims under state law. Although plaintiffs have alleged that jurisdiction is based in part on diversity, *see* Complaint at ¶ 2, they have not sufficiently alleged diversity of citizenship of the parties. Because the Court concludes that plaintiffs' federal proxy claim must be dismissed, the pendent state claims are dismissed without prejudice for lack of subject matter jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Albany Ins. Co. v. Esses,* 831 F.2d 41, 45 (2d Cir.1987).

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted, the proxy claim (count I) is dismissed, and all other claims are dismissed without prejudice. The Clerk of Court shall enter judgment accordingly and close the above-captioned action.

It is SO ORDERED.